UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA

    -against-                        NOTICE OF MOTION

                                          Cr. No. 09-0168 (S-2)(DLI)

MICHAEL ROMANO AND
WILLIAM KEARNEY,

              Defendants.
-----------------------------------------------------x


**Notice to Pro Se Litigant Who Opposes a Rule 56 Motion
For Summary Judgment**

      The Plaintiff in this case has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This means that the Plaintiff has asked the Court to decide this case without a trial, based on written materials, including affidavits, submitted in support of the motion. THE CLAIMS YOU ASSERT IN YOUR PETITION MAY BE DISMISSED WITHOUT A TRIAL IF YOU DO NOT RESPOND TO THIS MOTION ON TIME by filing sworn affidavits and/or other documents as required by Rule 56(c) of the Federal Rules of Civil Procedure and by Local Civil Rule 56.1. The full text of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 is attached. In short, Rule 56 provides that you may NOT oppose summary judgment simply by relying upon the allegations in your petition. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim. If you have proof of your claim, now is the time to submit it. Any witness statements must be in the form of affidavits. An

affidavit is a sworn statement of fact based on personal knowledge stating facts that would be admissible in evidence at trial. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to defendant's motion for summary judgment. If you do not respond to the motion for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the Plaintiff, the Court may accept Plaintiff's facts as true. Your case may be dismissed and judgment may be entered in Plaintiff's favor without a trial. If you have any questions, you may direct them to the Pro Se Office.

Dated: Central Islip, New York
      March 14, 2025

                            Respectfully submitted,
                            JOHN J. DURHAM
                            United States Attorney
                            Eastern District of New York
                            610 Federal Plaza, 5th Floor
                            Central Islip, New York 11722

                            /s/ Diane C. Leonardo
          BY:   Diane C. Leonardo
                            Assistant U.S. Attorney
                            (631) 715-7854

To: Karen  Kearney
   38 Meroke Avenue
   East Islip, New York 117330

**Fed. Rule Civ. P. 56**

Rule 56. Summary Judgment

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

(4) issue any other appropriate order.

(f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party; or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) Failing to Grant All the Requested Relief. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.

(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

**Local Civil Rule 56.1.**

Statements of Material Facts on Motion for Summary Judgment a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion. (b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried. (c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party. (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

2001 WL 47003
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF AMERICA
v.
John DAVIS, Defendant.

No. 00 Civ. 8296 SHS.
|
Jan. 17, 2001.

*OPINION & ORDER*

STEIN, J.

**\*1** John Davis seeks the return of property seized from him during a criminal investigation. The government opposes that application in part because it wishes to subject part of the property to forfeiture as substitute assets pursuant to 18 U.S.C. § 1963(m) and to retain part as evidence in an ongoing criminal investigation. For the reasons set forth below, (1) the government may subject to forfeiture the property seized from Davis's Brooklyn residence; (2) Davis's wife must follow the procedures delineated in 18 U.S.C. § 1963 in order to assert a claim to that property; and (3) the government may retain the property needed for the ongoing criminal investigation.

BACKGROUND
In 1998 the Federal Bureau of Investigations, pursuant to a warrant, searched the Brooklyn, N.Y. and Florida residences of John Davis and his wife Deborah in connection with an investigation into a burglary ring. The FBI seized numerous items from both homes, including clocks, lamps, and jewelry. On April 26, 2000, Davis pled guilty to participating in a racketeering enterprise pursuant to 18 U.S.C.1962(c) and conspiring to transport stolen property pursuant to 18 U.S.C. 371. Specifically, he admitted participating in a gang that burglarized hundreds of homes in New Jersey over the course of many years. As part of his sentence, which included 105 months in prison, Davis was ordered to forfeit $1.2 million pursuant to 18 U.S.C.1963. Five months after his sentencing, Davis filed this motion pursuant to Fed. R. Cr.

P. 41(e) for the return of the seized property. Rule 41(e) provides in pertinent part that "[a] person aggrieved ... by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property." [1]

DISCUSSION

Procedural Posture
The fact that the underlying criminal proceeding against Davis has already terminated would normally constitute a fatal defect to this Rule 41 motion. *See Onwubiko v. United States,* 969 F.2d 1392, 1397 (2d Cir.1992). However, because Davis is proceeding *pro se,* his papers need be read liberally. *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)); *see Hughes v. Rowe,* 449 U.S. 5, 9–10 (1980); *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) (per curiam). Therefore, the Court will treat Davis's motion as a new civil action, rather than treating it as a Rule 41(e) motion and dismissing it as moot in light of the termination of the underlying criminal action. *See Weng v. United States,* 137 F.3d 709, 711 n. 1 (2d Cir.1998); *Boero v. Drug Enforcement Administration,* 111 F.3d 301, 304–05 (2d Cir.1997); *Onwubiko,* 969 F.2d at 1397.

Substitute Assets
Davis is not entitled to the return of the items taken from his Brooklyn residence. These items are subject to forfeiture as substitute assets pursuant to 18 U.S.C. § 1963(m), which provides that if any of the property acquired in the course of racketeering activity cannot be located, has been transferred, or has been diminished in value, "the court shall order the forfeiture of any other property of the defendant up to the value of [the missing property]." The government "need not trace the proceeds of [defendant's] racketeering activities to identifiable assets" because "section 1963 imposes forfeiture directly on an individual as part of a criminal prosecution rather than in a separate proceeding in rem against the property subject to forfeiture." *United States v. Robilotto,* 828 F.2d 940, 948–49 (2d Cir.1987). Therefore, the

government may use the various clocks, lamps, jewelry, and other items seized from Davis's Brooklyn residence to satisfy the $1.2 million forfeiture ordered as part of his criminal sentence.

Deborah Davis' claim

**\*2** As noted above, Davis's wife, Deborah, has also signed the motion. However, there is insufficient information set forth for the Court to determine the validity of her claim. Accordingly, her motion is denied. However, pursuant to the procedures set forth in ⚑18 U.S.C. § 1963, she may petition the Court for a hearing to adjudicate the validity of any alleged interest in the property within 30 days of the final publication of the notice of forfeiture or her receipt of the notice itself, whichever is earlier. 28 U.S.C. § 1963(l)(2). That petition "shall set forth the nature and extent of [her] right, title, or interest in the property, the time and circumstances of [her] acquisition of the right, title, or interest in the property, any additional facts supporting [her] claim, and the relief sought." 28 U.S.C. § 1963(l)(3). Ms. Davis will be required to prove by a preponderance of the evidence that she has a legal claim to the property. ⚑*United States v. Lester,* 85 F.3d 1409, 1411 (9th Cir.1996). Her property interests are defined pursuant to state law—in this case, New York law; however, the federal forfeiture statutes determine whether those property interests must be forfeited to the government. ⚑*Id.* at 1412.

Evidence of a continuing criminal investigation

The government also seeks to withhold a 1986 appointment book and a Bible with handwritten names and telephone numbers and certain papers because the information they contain allegedly may become relevant evidence in the prosecution of at least two additional suspects. The government may retain these items as long as "retention is reasonably related to the government's interest in the property." *In re Perillo,* 1985 WL 8038 (E.D.N.Y. March 13, 1985) (quoting ⚑*United States v. Premises Known As 608 Taylor Ave.,* 584 F.2d 1297, 1299 (3d Cir.1978)). "The government is clearly permitted to seize evidence for use in investigations and trial ... [n]evertheless, the government may not, by exercising its power to seize, effect a de facto forfeiture by retaining the property seized indefinitely." ⚑*Premises,* 584 F.2d at 1302. "Property used as evidence must be returned once the criminal proceedings to which it relates have terminated." *Id.*

The criminal proceedings against Davis himself concluded in April of 2000; however, the government has made a good faith showing that the appointment book, Bible and paperwork are needed for its ongoing criminal investigation. Because the government's retention of these items is "reasonably related" to its interest in the property, Davis's application is denied. [2]

CONCLUSION

For the reasons set forth above, Davis's motion is granted in part and denied in part. The Court orders that: (1) the relevant items seized from the Brooklyn residence are subject to forfeiture as substitute assets; (2) the appointment book, Bible, and related papers may be retained by the government as evidence in its ongoing criminal investigation; (3) the relevant property seized from the Florida residence must be returned to Davis within 30 days.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 47003

---

**Footnotes**

1    Deborah Davis is named as a party in the body of the motion and has signed it.

2    This motion also originally sought the return of certain items seized from Davis's Florida residence. The government has consented to their return.

---

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    2

2024 WL 5399662
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

UNITED STATES of America,
v.
Michael LIEBERMAN, Defendant,
Dalana Lieberman, Interested Party.

3:15-CR-00161-PGS-TJB
|
Signed July 9, 2024

**Attorneys and Law Firms**

Paul Andrew Murphy, Assistant U.S. Attorney, Levine Lee LLP, New York, NY, Barbara Ward, Office of the U.S. Attorney, Newark, NJ, for United States of America.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

PETER G. SHERIDAN, United States District Judge

**\*1** This matter is before the Court on Petitioner Dalana Lieberman's—wife of Defendant Michael Lieberman ("Defendant")—ancillary petition. (ECF No. 27). She is seeking to prevent the forfeiture of her home at 9333 Standerwick Lane, Huntersville, North Carolina 28078 (hereinafter, the "Subject Property"). The Court held an ancillary hearing on June 17, 2024. [1]

For the reasons below, Petitioner's ancillary petition is denied. (ECF No. 27).

**I.**

**A. Findings of Fact**

1. Petitioner Dalana Lieberman ("Ms. Lieberman" or "Petitioner") is married to Defendant Michael Lieberman ("Defendant"); she was married to Defendant throughout all time periods relevant to the matter before the Court. (T13:25–T14:1; Ex. GX-13 at ¶ 1)

2. Defendant and Ms. Lieberman are still legally married although they live separately. (T13:25–T14:1).

3. Ms. Lieberman was not involved in the criminal activity underlying the Defendant's conviction. (Ex. GX-13 at ¶ 17).

4. There are three bank accounts that are relevant to this case. These are: (1) the PNC bank account ending in 7208 (the "McCartney Account"[2]); (2) the PNC bank Account Ending in 7451 (the "Defendant Lieberman Account"); and (3) the PNC Bank Account Ending in 1073 (the "Joint Account").

5. From on or about 2003 to on or about June or July of 2014, Ms. Lieberman and Defendant lived at a home in West Orange, New Jersey (the "West Orange Property"). (Ex. GX-13 at ¶¶ 13–14). Defendant purchased the West Orange Property on or about November 4, 2003. (*Id.* at ¶ 14). Defendant would later sell the West Orange Property on August 22, 2014.

6. As is relevant to this proceeding, Defendant and Ms. Lieberman's reported financial earnings for 2006 through 2014 are summarized below:

- In February 2009, the Social Security Administration ("SSA") notified Ms. Lieberman that she was entitled to monthly Social Security disability payments as of January 19, 2006. (*Id.* at ¶ 4)

- In February 2009, SSA made a $35,953 lump sum payment to Ms. Lieberman for the period from July 2006 through January 2009. (*Id.*)

- According to SSA, Ms. Lieberman's monthly payments of $1,334 began in February 2009. (*Id.*).

- In 2011, Defendant earned $79,574 in wages, salaries, and tips. (*Id.* at ¶ 5).

- In 2012, Defendant earned $82,513 in wages, salaries, and tips. (*Id.* at ¶ 6).

- In 2013, Defendant earned $77,245 in wages, salaries, and tips. (*Id.* at ¶ 7).

- In 2013, Ms. Lieberman received $18,083 in Social Security Benefits. (*Id.* at ¶ 8).

- In 2014, Defendant earned $64,846 in wages, salaries, and tips. (*Id.* at ¶ 9).

**\*2** • In 2014, Ms. Lieberman received $18,359 in Social Security Benefits. (*Id.* at ¶ 10).

7. During this time—specifically between June 2012 and May 2014—Defendant unlawfully diverted money totaling $1,640,822.69 from his employer, Crédit Agricole Securities, for his own use and benefit. (Ex. GX-13 at ¶ 15; Ex. GX-8 at ¶ 19; 23).

8. The purchase of the Subject Property occurred on June 25, 2014. (Ex. GX-13 at ¶ 11).

9. The purchase occurred when—by deed dated June 25, 2014—Defendant and Ms. Lieberman acquired title to Subject Property as tenants by the entirety under North Carolina law. (*Id.*).

10. This purchase occurred after the Defendant had begun unlawfully diverting funds from Crédit Agricole Securities.

11. The purchase price of the Subject Property was $438,000. (*Id.* at ¶ 12). Ms. Lieberman testified that she believed that the Subject Property was to be purchased with a mortgage. (T17:3–9). In actuality, the purchase was made by check or wire transfer and was not financed with a mortgage or loan. (Ex. GX-13 at ¶ 12).

12. Ms. Lieberman testified that she believed that her husband would be paying the mortgage online and she "should not expect to see any paper statements[ ]" and that "[b]ecause [her husband] was working at Wells [Fargo], [Ms. Lieberman] just assumed that he would be paying through his direct deposit." (T18:9–14).

13. Ms. Lieberman testified that she believed that she and her husband were putting a $45,000 down-payment on the home.

14. Of this downpayment, Ms. Lieberman testified that she "put all of [her] savings into the purchase of the [Subject Property;]" her savings consisting of the lump sum social security payment awarded to her in 2009. (T45:4–8).

15. Specifically, Ms. Lieberman asserts that she contributed $35,953 of her personal funds which had been awarded to her in retroactive Social Security Disability payments to the purchase of the home. (ECF No. 27 at 2; T46:2–9).

16. These personal savings were kept in cash in a safe in her home because Ms. Lieberman has a mistrust of banks rooted in her cultural beliefs. (T18:24–T19:2).

17. However, these funds were withdrawn and put in the safe at her house at a slow pace. Ms. Lieberman testified that she did not go to the bank to immediately withdraw her award. Ms. Lieberman testified that doing so "just seemed a bit, I don't know, for lack of a better phrase crazy." (T30:1–11).

18. She explained further that she "wouldn't feel comfortable walking the street or in a car with that amount of money[ ]" and she felt "like it would draw suspicion and flag [her] account." (*Id.*). Ms. Lieberman testified that she did not believe she would have withdrawn more than one thousand dollars at one time. (T30:19–23).

19. Instead of withdrawing this money at one time, Ms. Lieberman testified that she estimated that she had made more than thirty-six withdrawals from her account to take out the award she received. (T30:24–T31:3).

20. Because this money was kept in cash, Ms. Lieberman transferred the money over to her husband in-person, in-cash, and very slowly—the idea being that Defendant would deposit the money in the bank for her. (T18:9–16).

*3 21. Defendant was to deposit the funds into his own account, and at some point, Ms. Lieberman and Defendant "were going to open a joint account and then transfer [the funds] to that." (T19:9–13).

22. Ms. Lieberman testified that these transfers to her husband began occurring in 2012 or "maybe 2013." (T19:5–8).

23. Overall, Ms. Lieberman testified that she believed that approximately $9,000 (of what she believed to be the $45,000 downpayment) came from these funds. (T46:10–12).

24. On or about August 22, 2014—approximately two months after the purchase of the Subject Property—Defendant and Ms. Lieberman sold the West Orange Property at a loss; they received no proceeds from the sale. (*Id.* at ¶ 14).

25. Approximately five months after the purchase of the Subject Property on November 14, 2014, the Government filed a Notice of Lis Pendens against the Subject Property. (ECF No. 135 at 5).

Case 2:09-cr-00168-DC    Document 708-1    Filed 04/04/25    Page 9 of 50 PageID #: 7364

26. On April 15, 2015, pursuant to a plea agreement with the United States, Defendant pled guilty to a one-count Information charging him with wire fraud in violation of ⚑ 18 U.S.C. § 1343. (Ex. GX-13 at ¶ 14).

27. The charge was based on the Defendant's unlawful diversion of $1,640,822.69 from his employer Crédit Agricole Securities, which Defendant transferred to bank accounts for his own use and benefit. (*Id.*).

28. As part of his plea agreement, Defendant agreed to the forfeiture of the proceeds of his crime in the amount of $1,541,565. (ECF No. 14 at 2).

29. Defendant also agreed to forfeit his interest in the Subject Property. In relevant part, Defendant's plea agreement states that he agreed to forfeit to the United States "all the [D]efendant's right, title and interest in the real property and appurtenances known as [Subject Property] ... which the [D]efendant admits has the requisite nexus to the offense to which the [D]efendant has agreed to plead guilty." (ECF No. 14 at 4).

30. On September 18, 2015, the Court entered judgment sentencing Defendant to thirty-seven months of imprisonment followed by two years of supervised release. (ECF No. 19).

31. On December 23, 2015, Defendant conveyed to Ms. Lieberman all his interest in the Subject Property. The transfer was made by Quitclaim Deed recorded in the Register of Deeds for Mecklenburg County, North Carolina. (ECF No. 130-1 at Ex. C. ¶ 1; ECF No. 130-1 at Att. 1).

32. A notice of forfeiture was filed on April 17, 2017. (ECF No. 23). Ms. Lieberman filed her Petition for Ancillary Relief on April 26, 2017. (ECF No. 27).

33. At the present time, Ms. Lieberman lives at the Subject Property with her children, aged seventeen, twenty-two, and thirty. (T13:14–18). Her youngest child is currently in high-school.

34. Ms. Lieberman's eighty-one-year-old mother often stays with Ms. Lieberman on the Subject Property. (T13:21–23; T47:4–14).

35. To prove that the funds that were contributed to the purchase of the Subject Property were actually funds that Defendant had stolen, the Government called Federal Bureau of Investigation Special Agent Michelle Pickels ("Special Agent Pickels") to testify.

36. Special Agent Pickels' professional experience focuses on white collar crime, including "financial crimes, securities fraud, corporate fraud, bank fraud, wire fraud." (T52:7–11). Special Agent Pickels holds a degree in Accounting as well as a Master of Business Administration. (T53:9–12).

**\*4** 37. In relation to this case, Special Agent Pickels reviewed three account schedules for accounts at PNC Bank in connection with this crime in 2022. (T53:23–T54:10).

38. Special Agent Pickels specifically examined the bank accounts, scheduling out the bank accounts, as well as creating summary charts and pivot tables associated with these accounts. (T53:23–T54:10). While a contractor prepared the work, Special Agent Pickels reviewed the charts and spreadsheets prepared; she made changes as necessary to ensure their accuracy. (T77:16-22).

39. Special Agent Pickels and her team prepared a flow chart to summarize the data transactions at issue in this case. The flowchart, entered as Government's Exhibit 9, is reproduced below:



40. To prepare this flowchart, Special Agent Pickels summarized the funds in the various bank accounts, noting that funds from Crédit Agricole Securities—Defendant's former employer—were traced to all three accounts. (T72:14–22).

41. Overall, Special Agent Pickels summarized Government Exhibit 9 by stating that funds siphoned from Crédit Agricole Securities were used to purchase the Subject Property. (*Id.*).

42. Special Agent Pickels testified that the McCartney Account was opened on July 23, 2012 with wire transfers from Crédit Agricole Securities moving first to third parties and then, to the McCartney Account. (T66:22–T67:11; Ex. GX-8 at ¶¶ 18–19).

43. Special Agent Pickels testified that the Defendant Lieberman Account was opened on or about June 27, 2012 with the sole signer on the account being Defendant. (T67:17–21; GX-8 at ¶ 22).

44. Special Agent Pickels testified that the joint account was opened on June 16, 2012; both Petitioner's and Defendant's names were on the account and each of these individuals were signatories on the account. (T68:8-13; Ex. GX-8 at ¶ 26).

45. Special Agent Pickels testified that one of these accounts was used to fund the purchase of the Subject Property. That account was the Joint Account.

46. In reviewing the Joint Account, Special Agent Pickels testified that she was unable to identify any pattern of deposits into the Joint Account following the pattern set forth by Ms. Lieberman. (T70:15–T71:6).

47. Indeed, according to Special Agent Pickels, the pattern of deposits appeared to have been in large increments "usually in the thousands of dollars." (Ex. GX-8 at ¶ 19).

48. From September 6, 2012 to May 19, 2014, Defendant transferred more than $1.5 million from Crédit Agricole Securities' account to the McCartney Account.

49. There were unidentified deposits made to this account during this time, which consisted of about $1,305 transferred from the Defendant Lieberman Account and approximately $7,225 in unidentified branch deposits. (Ex. GX-8 at ¶ 19).

50. From September 7, 2012 to May 19, 2014, Defendant moved approximately $1,541,590.09 from the McCartney Account to the Defendant Lieberman Account. (Ex. GX-8 at ¶¶ 20; 23–24). Other credits to the Defendant Lieberman Account were biweekly direct deposits from Crédit Agricole Securities' bank account totaling $8,600 (Ex. GX-8 at ¶ 24; T68:14–T69:7; Ex. GX-26).

*5 51. There was also a total of about $85,362.97 from other sources consisting of about $20,843.85 in ATM deposits, $20,820.15 from returns/credits, and $43,698.97 from unidentified sources. (Ex. GX 8 at ¶ 24).

52. On or about July 24, 2012, Defendant and Ms. Lieberman opened the Joint Account. (Ex. GX-3; Ex. GX-8 at ¶ 26).

53. From the account's opening to its closing on June 24, 2014, about $711,285.58 was deposited to the account. Of this, $621,200 was transferred from Defendant Lieberman's Account and $69,254.66 was transferred directly from the McCartney Account totaling about $690,454.66. (Ex. GX-9).

54. This means that about 97% of the deposits to the Joint Account are traceable to the fraud. The remaining three percent of the deposits were qualified by Special Agent Pickels as "unidentified." This unidentified money is money that Ms. Lieberman claims to have contributed to the purchase of the home.

55. In addition to and aside from the money that Ms. Lieberman states that she contributed to the Subject Property's purchase, Ms. Lieberman states that she has been contributing her own money into the upkeep and maintenance of the Subject Property since its acquisition.

56. In support of this contention, Ms. Lieberman provided testimony and provided receipts for improvements she had made to the Subject Property. Ms. Lieberman testified that her recent expenses included three air-conditioning units, portions of a fence surrounding the Subject Property, the irrigation system on the Subject Property, and the furnace. (T23:23–T24:8).

57. Ms. Lieberman has also made improvements to the house prior to learning of Defendant's crime. (*See* Ex.

P-6). These purchases included, among other items, gas stovetops [3] television and home theater equipment, [4] as well as wrought iron banisters, [5] totaling thousands of dollars. However, not all of these purchases were paid for with monies traceable to Ms. Lieberman. For example, at the ancillary hearing, the Government demonstrated that some of these purchases were made with gift cards and with funds from the Defendant Lieberman Account. (T39:23-T49:14; *see* Ex. P-6 at P6_004).

58. Ms. Lieberman also provided proof of the tax bills for the years of 2015 through 2019. (Ex. P-5). Why tax bills for the years 2020 through 2024 were not provided to the Court was not explained at the hearing.

59. The Court issued a decision on a partial motion for summary judgment on December 21, 2023, finding that Ms. Lieberman's tenancy status did not as a matter of law prevent the Government from forfeiting any interest Ms. Lieberman might possess in the Subject Property. (ECF No. 138). The Court also found that Ms. Lieberman had standing to bring her claim. (*Id.* at 11).

60. The Court held an ancillary hearing on June 17, 2024. Thereafter, the Government moved for a Finding of Forfeitability, which the Court granted on June 28, 2024. (ECF No. 151).

## II.

After having shown that she has standing to bring her claim, [6] a petitioner who seeks to prevail in an ancillary proceeding and have the court amend an order of forfeiture must show that either she (1) has an interest in the forfeited property that was vested or superior at the time of the crime or (2) was a bona fide purchaser for value. 21 U.S.C. § 853(n)(6). Specifically, 21 U.S.C. § 853(n)(6) states:

**\*6** If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of

the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

Overall, the language in 21 U.S.C. § 853 makes clear that the Government "can forfeit and go after criminal earnings wherever they may be stashed—even in the hands of third parties." *United States v. Hallinan*, 75 F.4th 148, 150 (3d Cir. 2023). And, although criminal defendants possess "myriad procedural rights, those rights do not transfer to whoever may be holding the tainted property," and only " 'innocent' third parties can hang on to [a] property" purchased by proceeds. *Id.*

Under § 853(n)(6)(A), a petitioner must show that her interest vested prior to the commission of the Defendant's underlying crime since "[u]nder the 'relation back' rule, all property rights vest in the government 'upon the commission' of the crime." *United States v. Hallinan*, 75 F.4th 148, 152 (3d Cir. 2023) (citations omitted). Alternately, a petitioner may satisfy the parameters set forth under § 853(n)(6) (B) to obtain relief. Under this subsection, a petitioner must establish that she "is a bona fide purchaser for value ... and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture ...." *United States v. Lavin*, 942 F.2d 177, 185 (3d Cir. 1991). The phrase "bona fide purchaser for value" is not defined within the statute, but it reflects the general principle that "an innocent purchaser for valuable consideration must be protected." *Id.* at 186 (citations and internal marks omitted). Overall, either of these provisions must be proven by the petitioner by the preponderance of the evidence. 21 U.S.C.A. § 853(n)(6).

## III.

### A. Credibility of the Witnesses

At the ancillary hearing the Court has three roles. The Court's duty is (1) to decide the facts from the evidence that was

presented during the hearing; (2) to apply the law to the facts; and (3) to clearly explain the facts and the legal principles underpinning its decision.

As the trier of fact, I perform my duties fairly and impartially, and I follow the same preliminary charges that I instruct ordinarily to a jury. More particularly, I consider all the evidence presented and use my common sense—in light of everyday experience with people and events—to determine the credible facts and I give the evidence whatever weight I believed it deserved. *See* Third Circuit Model Jury Charge § 1.5.

**\*7** In the present matter, Ms. Lieberman's credibility is in question given both the nature of her story as well as the fact that Ms. Lieberman only has her own testimony to corroborate that story.

### B. Conclusions of Law

Ms. Lieberman seeks to prevent the forfeiture of the Subject Property—her home and the home of her three children. Unfortunately, Ms. Lieberman has failed to show that she falls within either category under ⚑ § 853(n)(6)(A) or ⚑ § 853(n)(6)(B) by the preponderance of the evidence, and the Court is unable to grant her the relief she seeks.

With respect to ⚑ § 853(n)(6)(A), the Court agrees with the Government that Petitioner has failed to prove her claim that a portion of her own funds were used to purchase the Subject Property. Further, the Court finds that the Government has shown that Defendant purchased the Subject Property with stolen funds prior to Ms. Lieberman having contributed anything to them.

Beginning in June 2012, Defendant began perpetrating the crime for which he eventually was charged in an Information. (ECF No. 11). Here, Ms. Lieberman and Defendant purchased the Subject Property by deed dated June 25, 2014 as tenants by the entirety under North Carolina law. As such, under the relation-back doctrine, Ms. Lieberman is ineligible for relief under ⚑ § 853(n)(6)(A) since the Government's interest had vested on or about June 2012. And although Petitioner received her lump sum Social Security payment of $35,953 in early February 2009, Petitioner is unable to show that any amount of that money was used to pay for the Subject Property.

Petitioner has provided no documents or proof aside from her own testimony that she contributed these monies to the Subject Property, relying instead on the bank account statements showing ATM cash deposits totaling about $20,843.85 and other deposits totaling about $43,698.97. (T96:20-T97:6; Ex. GX-19). Unfortunately, Petitioner has not proven that these funds were contributed by her. Particularly where Petitioner has testified that she and her husband maintained separate financial affairs aside from this money—and the Court only has Petitioner's testimony on the same—Ms. Lieberman has not shown by the preponderance of the evidence that the cash deposits are actually her lump sum Social Security payment. Therefore, the Court cannot find that any amount of the money in these bank accounts was actually Ms. Lieberman's lump sum Social Security payment and that she contributed any of her own money to the purchase of the Subject Property.

Petitioner also advances the argument that, because she had a superior interest in her lump sum Social Security payment, she satisfies the dictates of ⚑ § 853(n)(6)(A). This argument fails for two reasons. First, it does not address the clear statutory language that requires Petitioner to show she has an interest in "the property;" here, the property is the Subject Property, not Ms. Lieberman's lump sum Social Security payment. Second, this argument fails because, again, Petitioner has not proven that she contributed any funds to the purchase of the Subject Property. Ultimately, the only evidence presented by Ms. Lieberman that she contributed to the purchase of the Subject Property is (1) the fact that the Subject Property's purchase was made from a joint account (the Joint Account) which bore her name; (2) the fact that Ms. Lieberman received a lump sum Social Security payment in 2009; and (3) Petitioner's own testimony that she handed her husband small increments of cash over a period of years for him to deposit at the bank. This evidence is insufficient to meet the burden of proof.

**\*8** In a similar way, when examining ⚑ § 853(n)(6)(B), Petitioner has failed to show that she contributed any funds to the purchase of the Subject Property such that she was a bona fide purchaser for value. The evidence presented to the Court is that the funds for the purchase of this property came from a wire transfer that was transferred from three accounts that were in receipt of money siphoned from Crédit Agricole Securities. "The purpose of the bona fide purchaser exception to the forfeiture rules to 'protect[ ] the title of a purchaser who acquires property for valuable consideration and who, at the

time of the purchase, is without notice that the seller lacks valid and transferable title in the property.' " 🚩*United States v. Lucas*, No. 14-cr-52, 2019 WL 11648743, at *5 (D.N.J. Aug. 20, 2019) (quoting 🚩*Lavin*, 942 F.2d at 186), *rev'd on other grounds*, 986 F.3d 224 (3d Cir. 2021).

Nor do the improvements that Ms. Lieberman made to the Subject Property qualify her as a bona fide purchaser for value, as all these improvements do not demonstrate how Ms. Lieberman was making arm's length transactions with her husband. *See, e.g.*, *United States v. Joyce*, No. 07-31, 2011 WL 1102986, at *5 (W.D. Pa. Mar. 22, 2011) (in denying petitioner-wife's petition, noting that petitioner-wife's claims that she engaged in an arms-length transaction with her husband after the purchase of her property were not proven and that "[w]hile it may be possible for such a transaction to occur outside the commercial context and between spouses, the petitioner at minimum must be able to prove that she negotiated the transaction with an expectation that she would receive equivalent value in return, thereby protecting her own interest."); 🚩*United States v. Alquzah*, 91 F. Supp. 3d 818, 827 (W.D.N.C. 2015) (finding at summary judgment that petitioner-wife could not prevail on the argument that she was a bona fide purchaser for value given that "she ha[d] identified no 'arm's-length transaction' or exchange of 'equivalent value' between herself and Defendant ...."). There are no facts within this case demonstrating that Petitioner engaged in an arms-length interaction with her husband such

that she is a bona fide purchaser for value under 🚩§ 853(n)(6)(B).

Unfortunately, the mandates set forth in 🚩§ 853(n) are clear. As explained by the Third Circuit:

> The legislative history of 🚩section 853(n), contrary to [the petitioner's] contentions, does not evince a broad-based intent to protect the interests of all innocent third parties. Congress instead defined two rather limited categories of third parties [under 🚩sections 853(n)(6)(A) and (B)] who are entitled to petition the courts for a hearing to adjudicate the validity of their interests in the forfeited property.

🚩*Lavin*, 942 F.2d at 186. Ms. Lieberman does not satisfy either category under the statute. The Court is bound by the clear statutory guidelines.

**All Citations**

Slip Copy, 2024 WL 5399662

---

## Footnotes

1    Ms. Lieberman requested to appear virtually at the ancillary hearing. (ECF No. 143). The Court granted her request. (ECF No. 144). Before proceeding with the ancillary hearing, the Court advised Ms. Lieberman of her rights and asked if Ms. Lieberman wished to proceed virtually. (T11:10–T12:6). Ms. Lieberman confirmed that she did. (T12:4–7). The Court then made a finding that, based upon the circumstances in the present matter, a virtual appearance by Ms. Lieberman was reasonable and necessary. (T11:10–T13:4). The ancillary hearing then began.

2    The full title on the account is the "S. McCartney Re-Election Campaign Fund." (Ex. GX-1). Defendant's name is also on this account. (*Id.*).

3    (*Id.* at P-6_002).

4    (*Id.* at P-6_003).

Case 2:09-cr-00168-DC    Document 708-1    Filed 04/04/25    Page 14 of 50 PageID #: 7369

(*Id.* at P-6_009).

Given that the Court found that Petitioner had standing to bring her claim, standing is not analyzed within this Memorandum and Order.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:09-cr-00168-DC    Document 708-1    Filed 04/04/25    Page 14 of 50 PageID #: 7369

⚑ KeyCite Yellow Flag - Negative Treatment
Distinguished by   In re $6,871,042.36,   D.D.C.,   November 8, 2016

2012 WL 1142292
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America
v.
Bernard L. MADOFF, Defendant.
Epstein, Becker & Green, P.C., Petitioner.

No. 09 Cr. 213(DC).
|
April 3, 2012.

**Attorneys and Law Firms**

Preet Bharara, Esq., United States Attorney for the Southern
District of New York, by: Matthew L. Schwartz, Esq., Barbara
A. Ward, Esq., Assistant United States Attorneys, New York,
NY, for United States of America.

Epstein, Becker & Green, P.C., by: Daniel R. Levy, Esq.,
Newark, NJ, for Petitioner.

*MEMORANDUM DECISION*

CHIN, Circuit Judge.

**\*1**  In June 2007, petitioner Epstein, Becker & Green,
P.C. ("EBG") began representing Ruth Madoff on a matter
unrelated to Bernard Madoff's criminal case. On March 12,
2009, Bernard Madoff pled guilty to securities fraud and
related crimes that began at least as early as the 1980s.
In May 2009, EBG attained a settlement agreement on
Ruth Madoff's behalf. The funds due to Ruth Madoff under
the settlement, however, were forfeited to the government
because the settlement was reached after Bernard Madoff's
guilty plea.

On March 14, 2011, pursuant to ⚑ 21 U.S.C. § 853(n), EBG
petitioned for a criminal forfeiture hearing. EBG principally
argues that it is entitled to legal fees totaling $24,790.86
from Ruth Madoff's forfeited settlement funds because: (1)
it holds a superior interest in such funds under ⚑ 21 U.S.C.

§ 853(n)(6)(A); and (2) it is a bona fide purchaser for value
under ⚑ 21 U.S.C. § 853(n)(6)(B). On April 29, 2011, the
government moved to dismiss the petition.

For the reasons set forth below, the government's motion is
granted. Accordingly, EBG's petition is dismissed.

**BACKGROUND**

**A.** *The New Jersey Action*
On or about April 27, 1993, Robert S. Gettinger, Esq.,
and Ruth Madoff entered into a Partnership Agreement
(the "Partnership Agreement") with Magnetic Services,
Inc. ("Magnetic Services"), a New Jersey corporation. (NJ
Compl. 4). [1] The Partnership Agreement created New Jersey
MR Imaging, L.P. (the "Partnership") to: lease an office
in Hoboken, New Jersey; acquire a Magnetic Resonance
Imaging (MRI) machine; and operate a medical center where
magnetic imaging and related services would be provided.
(Pet. Ex. A 4). Magnetic Services was the general partner
and Gettinger and Ruth Madoff were limited partners. (*Id.* at
1, 10). As limited partners, Gettinger and Ruth Madoff each
contributed $150,000 to the enterprise and each was entitled
to 25 percent of the Partnership's profits. (*Id.* at 42, 67).

Under the Partnership Agreement, the Partnership was to
dissolve on June 30, 2005, but would "not terminate until
its assets [had] been distributed." (*Id.* at 4–5). By June
2007, two years after the predetermined dissolution date, the
Partnership's assets had not been liquidated and distributed to
Gettinger and Madoff as limited partners. (NJ Compl. 1–2).
The limited partners consequently engaged EBG to initiate
a breach of contract claim against Magnetic Services and its
President, Dr. Mark Berger. [2] (Pet.Ex.I). On June 29, 2007,
EBG filed a complaint in the United States District Court
for the District of New Jersey (the "New Jersey Action").
(Pet.Ex.A).

**B.** *The Madoff Forfeiture*
On December 11, 2008, Bernard Madoff was arrested. On
March 10, 2009, Bernard Madoff was charged by information
with eleven counts of offenses related to the ponzi scheme that
he facilitated through his investment advisory firm, Bernard
L. Madoff Investment Securities. (Inf.¶¶ 15–41). The scheme
was alleged to have begun at least as early as the 1980s,
continuing until the time of Madoff's arrest. (*Id.* ¶ 4). The

Information also included two forfeiture allegations. [3] (*Id.* ¶¶ 42–45).

 **\*2** On March 12, 2009, Bernard Madoff pled guilty to all eleven counts of the March 10, 2009 Information. On June 29, 2009, I sentenced him to 150 years' imprisonment. (Judgment, ECF Doc No. 100, 4, *United States v. Madoff,* No. 09 Cr. 213 (S.D.N.Y. June 29, 2009)). On June 26, 2009, I entered a Forfeiture Order including criminal forfeiture money judgments totaling $170,799,000,000 and the forfeiture of specific property. (POF 6). The specific property included "any and all ownership interest held in the name of Ruth Madoff and/or Bernard Madoff in the assets of any and all corporations, partnerships or other entities, and/or their subsidiaries, affiliates, and joint ventures." (POF Ex. A ¶ 19).

By a separate Stipulation and Order dated June 29, 2009, Ruth Madoff agreed to be bound by the terms of the Forfeiture Order as if they applied equally to her. Apart from the $2,500,000 that the government permitted Ruth Madoff to retain, she expressly agreed to forfeit to the United States "any and all property and other interests belonging to, owed to or controlled in whole or in part by Ruth Madoff, and all property traceable to such property." (Ruth Madoff Stip. ¶ 9).

### C. *The New Jersey Action Settlement*
On May 14, 2009, approximately five months after Bernard Madoff's arrest, the New Jersey Action was settled. (Pet.Ex.B). On January 4, 2010, in light of Madoff's conviction and its related forfeitures, the New Jersey District Court ordered Magnetic Services to deliver the settlement funds due to Ruth Madoff to the cashier of the New Jersey District Court. (Pet.Ex. C). On January 8, 2010, pursuant to this order, Magnetic Services deposited a total of $61,993 to the cashier of the New Jersey District Court. (Pet.Ex.D).

### D. *EBG's Stipulation with the Government*
On August 3, 2010, EBG and the government entered into the EBG Stipulation. EBG conceded that the settlement funds retained by the New Jersey District Court were encompassed by the Forfeiture Order. (Pet. Ex, F 2). Accordingly, on or about October 26, 2010, the New Jersey District Court transferred the settlement funds to the cashier of this Court. (*Id.* at 3).

In the EBG Stipulation, the government stated that it did not "intend to oppose the disbursement of reasonable fees and expenses properly due and owing to [EBG]," but it had not yet "had access to the settlement agreement resolving [the case] ... nor to the engagement materials or fee agreements between [Madoff and Gettinger] and [EBG]." [4] (*Id.*). The parties agreed that any disbursement that occurred would be "consistent with any engagement materials, retainer, or fee agreements, and the forfeiture laws." (*Id.*).

### E. *EBG's Petition*
On March 14, 2011, pursuant to 21 U.S.C. § 853(n), EBG submitted a third-party petition for a criminal forfeiture hearing to assert a claim to the New Jersey Action settlement funds. The government subsequently moved to dismiss.

### *DISCUSSION*

### A. *Legal Standard for a Motion to Dismiss a Third–Party Petition in a Forfeiture Proceeding*
 **\*3** A third party may petition the court for a hearing to adjudicate its purported interest in property subject to criminal forfeiture under 21 U.S.C. § 853(n)(2). Such petitions must "set forth the nature and extent of the petitioner's right, title, or interest in the property, [and] the time and circumstances of the petitioner's acquisition of the right, title, or interest." 21 U.S.C. § 853(n) (3).

A motion to dismiss a third-party petition asserting an interest in property subject to a criminal forfeiture proceeding is treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b). *Pacheco v. Serendesky,* 393 F.3d 348, 352 (2d Cir.2004). The petition must set forth " 'enough facts to state a claim to relief that is plausible on its face' " to survive dismissal. *Willis Mgmt. Ltd. v. United States,* 652 F.3d 236, 241–42 (2d Cir.2011) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Although the court must assume the facts set forth in the petition as true, Fed.R.Crim.P. 32.2(c)(1)(A), the court is not required to accept legal conclusions advanced by the parties. *Willis Mgmt.,* 652 F.3d at 242. In considering EBG's petition, this Court therefore assumes all the facts set forth in the petition and accompanying exhibits to be true and draws all reasonable inferences in favor of EBG.

**B. *EBG's Claims Under* 21 U.S.C. § 853(n )**

A third-party petitioner may establish a valid interest in forfeited property and obtain relief under § 853(n) in two ways. *See* 21 U.S.C. § 853(n)(6)(A), (B). First, under § 853(n)(6) (A), a petitioner can establish, by a preponderance of the evidence, that he has a legal interest in the property that "renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in [him] rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts" giving rise to the forfeiture. 21 U.S.C. § 853(n)(6)(A). Second, under § 853(n)(6) (B) the petitioner can establish, by a preponderance of the evidence, that he is a bona fide purchaser for value of the property who was reasonably without cause to believe that the property was subject to forfeiture at the time of the purchase. 21 U.S.C. § 853(n)(6)(B). A legal interest is required to obtain an ancillary hearing under both § 853(n)(6)(A) and (B). 21 U.S.C. § 853(n) (2); *see* *United States v. Ribadeneira,* 105 F.3d 833, 835 (2d Cir.1997) (per curiam) (noting "§ 853(n)(6)'s reference to a right, title, or interest in the property ... [is] the same as § 853(n) (2)'s requirement of a legal interest in property, which is necessary for standing") (internal quotation marks omitted). Additionally, the forfeitability of third-party interests is determined by federal law, while their existence is determined by state law. *See* *United States v. Hooper,* 229 F.3d 818, 820 (9th Cir.2000); *United States v. Peterson,* No. 04 Cr. 752, 2011 WL 5110246, at *4 (S.D.N.Y. Oct.28, 2011).

**\*4** EBG argues that it is entitled to a portion of the settlement funds from the New Jersey Action because: (1) it holds a legal interest superior to that of the government, *see* 21 U.S.C, § 853(n)(6)(A); and (2) it is a bona fide purchaser for value, *see* 21 U.S.C. § 853(n)(6)(B). (Pet.6). Each claim is discussed in turn.

**1. 21 U.S.C. § 853(n)(6) (A )**

**a. *Applicable Law***

Under 21 U.S.C. § 853(n)(6)(A), a third-party petitioner may prevail if he establishes that his "legal right, title, or interest in the property" in question is superior to that of the government "at the time of the commission of the act which gave rise to the forfeiture." *See* 21 U.S.C. § 853(n)(6)(A); *Pacheco,* 393 F.3d at 353.

First, a legal interest sufficient to establish a "right, title, or interest in the [forfeited] property" under § 853(n) (6), must be "in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account," *Ribadeneira,* 105 F.3d at 836–37. The Second Circuit thus denies standing to general creditors under § 853(n) (6). [5] *Id.* A general creditor, "upon giving credit, takes no right against specific property of the debtor." *Black's Law Dictionary* 425 (9th ed.2009); *see also* *United States v. Schwimmer,* 968 F.2d 1570, 1579 (2d Cir.1992) (stating a general creditor does not "assert either title to or interest in any specific asset in [a] combined forfeiture pool"). To have a claim in the specific property, a creditor, therefore, must secure a judgment or perfect a lien against a particular item. *See* *Ribadeneira,* 105 F.3d at 836.

Second, an interest in criminally forfeited property is superior to the government's interest if it arose before the government's interest vested. *See* 21 U.S.C. § 853(n)(6) (A); *Pacheco,* 393 F.3d at 353; *Hooper,* 229 F.3d at 821. Under the "relation back doctrine," the government's interest vests for offense property—"any property constituting, or derived from, any proceeds the person obtained directly or indirectly" as the result of the crime—at the time of the commission of the acts giving rise to the forfeiture. [6] *See* 21 U.S.C. § 853(a)(1), (c). The relation back doctrine serves the important purpose of preventing defendants from circumventing forfeiture by transferring property prior to their convictions. *Peterson,* 2011 WL 5110246, at ——6–7 (quoting *United States v. Parrett,* 530 F.3d 422, 430 (6th Cir.2008)).

**b. *Application***

EBG's § 853(n)(6)(A) claim fails because it cannot assert a sufficient legal interest in the settlement funds. EBG argues

that it possesses a "lien interest" in the funds pursuant to New Jersey's Attorney's Lien Act (the "Act"), N.J. Stat. Ann. § 2A:13–5. (EBG Mem. 12). Indeed, the Act provides that "[a]fter filing a complaint ... the attorney ... shall have a lien for compensation." N.J. Stat. Ann. § 2A:13–5. Under New Jersey law, however, merely filing a complaint does not establish possession of a lien interest. *See* *Hoffman & Schreiber v. Medina,* 224 B.R. 556, 561 (D.N.J.1998) ( "[C]reation of an interest in property is not synonymous with perfection of that interest."). To enforce a lien under the Act, an attorney must file an application with the court; otherwise, the attorney will lose the right to assert an attorney's lien against any proceeds derived from his services. [7] *Id.* at 562; *see also* *Musikoff v. Jay Parrino's The Mint, L.L.C.,* 172 N.J. 133, 796 A.2d 866, 873–74 (N.J, 2002) (discussing requisite filing to perfect lien interest under New Jersey law).

**\*5** Here, EBG acknowledges that it did not "fil[e] a petition to enforce its lien in the New Jersey Court." [8] (EBG Mem. 14). Thus, EBG does not possess a legal interest in the funds under New Jersey state law. Because EBG does not have a lien, it does not possess a sufficient legal interest under federal law to prevail under § 853(n)(6)(A). Without a lien, EBG cannot claim interest in a particular asset, and it is merely a general creditor. *See* *Ribadeneira,* 105 F.3d at 836–37 (finding holders of checks drawn on forfeited accounts "have no specific interest in property greater than that of a general creditor"). Because "a general creditor may [not] achieve standing," *id.* at 836, EBG cannot demonstrate it possesses a legal "right, title, or interest in the property," *see* 21 U.S.C. § 853(n)(6)(A), (B).

Second, even assuming EBG had a valid interest in the settlement funds, its claim fails under § 853(n)(6)(A) because EBG's interest would not have predated commission of the acts giving rise to the forfeiture. Bernard Madoff's scheme began at least as early as the 1980s (Inf.¶ 4), and part of the property subject to forfeiture from this scheme included Ruth Madoff's assets (POF Ex. A ¶ 19). Given that EBG's interest could not have arisen until June 2007, at the earliest, the interest would not have predated the government's interest in the settlement funds. Therefore, even if EBG established a valid interest in the settlement funds, its interest would not

have been superior to that of the government. Accordingly, EBG's § 853(n)(6)(A) claim fails.

### 2. *21 U.S.C. § 853(n)(6) (B )*

#### a. *Applicable Law*

Under 21 U.S.C. § 853(n)(6)(B), a third-party petitioner may prevail if he establishes that: (1) he acquired the interest in question as a bona fide purchaser for value as defined by state law; (2) he possesses a legal right, title, or interest in the forfeited property; and (3) he was reasonably without cause to believe that the property was subject to forfeiture at the time the interest was acquired. 21 U.S.C. § 853(n)(6)(B); *see* *Ribadeneira,* 105 F.3d at 835. A petitioner generally has reason to believe that property is subject to forfeiture after an arrest or indictment of its owner has occurred. *Timley,* 507 F.3d at 1131.

#### b. *Application*

Here, for the reasons stated above, EBG's § 853(n)(6)(B) claim also fails because it did not perfect its lien and, as "a general creditor" without a legal interest in the settlement funds, it "may [not] achieve standing by virtue of being a bona fide purchaser for value" under § 853(n)(6)(B)." *Ribadeneira,* 105 F.3d at 836.

### CONCLUSION

EBG cannot prevail under 21 U.S.C. § 853(n) because it cannot assert a legal interest in the forfeited property. Accordingly, EBG's petition is denied and the government's motion to dismiss is granted. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1142292

## Footnotes

1    References are as follows: "NJ Compl." to the Complaint filed by EBG on behalf of Robert S. Gettinger and Ruth Madoff in the New Jersey District Court of June 29, 2007; "Inf." to the Information of March 10, 2009 charging Bernard Madoff with eleven counts of offenses related to the ponzi scheme that he orchestrated; "Forfeiture Order" or "POF" to this Court's Preliminary Order of Forfeiture/Final Order of Forfeiture of June 26, 2009; "Ruth Madoff Stipulation" or "Ruth Madoff Stip." to the Stipulation between Ruth Madoff and the government of June 29, 2009; "EBG Stipulation Agreement" or "EBG Stip." to the Stipulation between EBG and the government of August 3, 2010; "Pet." to the Third–Party Petition of Epstein Becker & Green, P.C, for Hearing on Forfeiture Proceedings Pursuant to 28 U.S.C. § 853 of March 14, 2011; "Gov. Mem," to Memorandum of Law in Support of the Government's Motion to Dismiss the Third–Party Petition of Epstein, Becker & Green, P.C. of April 29, 2011; "Schwartz Decl." to the Declaration of Assistant United States Attorney Matthew L. Schwartz of April 29, 2011; "EBG Mem," to the Memorandum of Law in Opposition to the Government's Motion to Dismiss the Third–Party Petition of Epstein Becker & Green, P.C. of June 3, 2011; "Levy Decl." to the Declaration of EBG attorney Daniel R. Levy of June 3, 2011.

2    The government contends that EBG was not engaged by Ruth Madoff. (*See* Gov. Mem. 12, 23–24). In light of this decision dismissing EBG's petition, this issue need not be resolved.

3    The first forfeiture allegation related to the offenses charged in Counts One, Three, Four, and Eleven of the Information, which constitute "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7). (Inf.¶¶ 42–43). The second allegation sought criminal forfeiture, pursuant to 18 U.S.C. § 982, of all property involved in the money laundering offenses. (Inf.¶¶ 44–45).

4    The EBG Stipulation also vacated this Court's November 6, 2009 Sealing Order for the Settlement Agreement between Ruth Madoff, Gettinger, and Magnetic Services. (Pet. Ex. F 3).

5    Not all courts deny standing to general creditors under § 853(n)(6). *See United States v. Reckmeyer,* 836 F.2d 200, 205 (4th Cir.1987) ("We conclude that unsecured creditors of persons whose property is subject to forfeiture have a 'legal interest' in the debtor's property.").

6    EBG has stipulated that Ruth Madoff's settlement funds constitute offense property. (*See* EBG Stip. 2 (quoting the Forfeiture Order and noting that it includes " '[a]ny and all ownership interest held in the name of Ruth Madoff and/or Bernard Madoff in the assets of any and all corporations, partnerships, or other entities, and/or their subsidiaries, affiliates, and joint ventures' as well as 'any and all property and other interests in which the defendant has or will acquire an interest,' which includes the [New Jersey Action settlement] [f]unds.").

7    In *Hoffman & Schreiber,* the New Jersey District Court, applying New Jersey state law, found that "attorneys were not entitled to a lien on the fruits of their efforts" where they failed to follow the proper procedures in perfecting their liens. *Hoffman,* 224 B.R. at 563–64.

8    EBG argues in its Opposition to the Government's Motion to Dismiss that the government should be equitably estopped from challenging its lien interest in the funds. (EBG Mem. 13). In EBG's initial petition, however, EBG merely argued that it "has a legal interest" in the settlement funds and that it "qualifies as a 'bona fide purchaser for value' under 28 U.S.C. § 853(n)(6) (B)." (Pet.6–7). EBG's equitable estoppel argument is thus being made for the first time in its Opposition to the Government's Motion to Dismiss. (EBG Mem. 13). "[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss." *Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 216 (S.D.N.Y.1997) (internal quotation marks and

2012 WL 1142292

citations omitted) (citing sources). Hence, because EBG has not submitted an amended petition nor offered sufficient facts to support its claim of equitable estoppel, this argument is rejected. *See id.*

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 Positive

As of: March 14, 2025 7:29 PM Z

# *United States v. Tucker*

United States District Court for the Southern District of New York

November 24, 2020, Decided; November 24, 2020, Filed

16-cr-91 (PKC)

**Reporter**

2020 U.S. Dist. LEXIS 220578 *; 2020 WL 6891517

UNITED STATES OF AMERICA, -against- SCOTT TUCKER, Defendant.

**Prior History:** *United States v. Tucker, 2017 U.S. Dist. LEXIS 134265 (S.D.N.Y., Mar. 1, 2017)*

**Core Terms**

forfeiture, notice, preliminary order, final order, properties, summary judgment, third party, forfeited, petitions, ancillary proceeding, asserting, funds, amended petition, public notice, discovery, nonmoving, summary judgment motion, movant, untimely, motion to dismiss, forfeiture order, receive notice, deposition

**Counsel:** **[\*1]** For USA, Plaintiff: Niketh Varadaraj Velamoor, LEAD ATTORNEY, United States Attorney's Office, SDNY, New York, NY; Hagan Cordell Scotten, U.S Attorney's Office, SDNY, New York, NY; Sagar Kananur Ravi, U.S. Attorney's Office-Southern District of New York, New York, NY.

**Judges:** P. Kevin Castel, United States District Judge.

**Opinion by:** P. Kevin Castel

**Opinion**

OPINION AND ORDER

CASTEL, U.S.D.J.

Kim Tucker, the now ex-wife of defendant Scott Tucker, has filed a petition and an amended petition to vacate the Final Order of Forfeiture entered by this Court on February 22, 2019. See *21 U.S.C. § 853(n)*; *Rule 32.2(c), Fed. R. Crim. P.* She asserts that the Final Order of Forfeiture wrongfully includes four items of property in which she has a lawful

ownership interest, specifically including one investment account maintained with Charles Schwab Corporation ("Charles Schwab") and one maintained with the Midwest Trust Company ("Midwest"), and parcels of real property located in Leawood, Kansas and Aspen, Colorado. Kim Tucker represents herself pro se.

After Kim Tucker filed her petition, the parties engaged in discovery, including the taking of Ms. Tucker's deposition. The government now moves to dismiss the petition and amended petition as untimely filed, and for summary judgment **[*2]**  in its favor as to Kim Tucker's claim directed to the Leawood, Kansas property, pursuant to *Rule 56, Fed. R. Civ. P.*

Any petition for an ancillary proceeding directed to an order of forfeiture must be filed within 30 days of the government's final notice of publication, or within 30 days of the petitioner's receipt of actual notice of the assets to be forfeited, whichever is earlier. *21 U.S.C. § 853(n)(2)*. Here, Kim Tucker filed her first petition on April 13, 2019, more than ten months after the government concluded its publication of the forfeiture notice on May 23, 2018.

For the reasons that will be explained, the petition and amended petition will therefore be dismissed as untimely. Separately, even if the petitions had been timely brought, no reasonable finder of fact could find that Kim Tucker has demonstrated an interest in the Leawood, Kansas property that warrants vacateur or modification of the forfeiture. The government's motion for summary judgment on Kim Tucker's claim directed to the Leawood property will therefore be granted.

BACKGROUND.

An indictment filed on February 9, 2016 charged defendant Scott Tucker with various crimes related to his ownership and operation of certain payday-lending businesses. (Docket # 1.) **[*3]**  He entered a plea of not guilty on February 23, 2016. On April 8, 2016, this Court issued a Post-Indictment Restraining Order as to certain specified assets. (Docket # 30.)

Following trial, on October 13, 2017, a jury found Scott Tucker guilty of all fourteen counts charged in the S1 Indictment. (Docket # 259.)

On February 13, 2018, the Court entered a Preliminary Order of Forfeiture, which ordered the forfeiture of "any property, constituting or derived from, any proceeds obtained, directly or indirectly, from the unlawful collections of debt charged in Counts One, Two, Three, and Four of the Indictment . . . ." (Docket # 336.) This Order listed properties including any and all funds in a Charles Schwab account with account number 97363826 (the "Charles Schwab Account"); any and all funds in a Midwest Trust Company account

with account number 10840017641 (the "Midwest Account"); and all right and title to real property in Aspen, Colorado and Leawood, Kansas.[1] (Docket # 336.)

On March 16, 2018, Scott Tucker filed an objection to the Preliminary Order of Forfeiture, asserting, among other things, that two IRA accounts in the name of Kim Tucker ought not be included in the Order. **[*4]**  (Docket # 342.) That objection did not challenge the inclusion of the Schwab and Midwest accounts now in dispute, nor of the properties in Aspen or Leawood. (Id.) The government thereafter agreed to remove the IRA accounts from its forfeiture application, and, on April 17, 2018, the Court entered an Amended Preliminary Order of Forfeiture that omitted the IRA accounts. (Docket # 344.)

On April 24, 2018, the government published at www.forfeiture.gov a Notice of Forfeiture identifying all properties listed in the Amended Preliminary Order of Forfeiture, including those now challenged by Kim Tucker. (Docket # 374.) The publication advised third parties claiming an interest in the properties that they "must file an ancillary petition within 60 days of the first date of publication (April 24, 2018) . . . ." (Id.) The notice was continuously published for 30 days, through May 23, 2018. (Id.) Separately, on May 1, 2018, notice of the Amended Preliminary Order of Forfeiture was sent by Federal Express to Kim Tucker at both an address in Leawood, Kansas and a Post Office Box in Overland Park, Kansas. (Ravi Dec. Ex. H.) The accompanying cover letter advised her of the deadlines to assert a legal **[*5]**  interest in the properties pursuant to _21 U.S.C § 853(n)_. (Id.)

On June 11, 2018, the Court entered an Order that stayed execution of the forfeiture of the Leawood, Kansas property, pending the outcome of Scott Tucker's appeal of his judgment and conviction. (Docket # 358.)

On November 13, 2018, Kim Tucker e-mailed one of Scott Tucker's attorneys, Nadjia Limani, inquiring about the distinction between a preliminary forfeiture order and a final order of forfeiture. (Ravi Dec. Ex. K.) Ms. Limani responded that after the filing of the preliminary order, certain parties had submitted third-party petitions claiming interest in the properties identified therein, and stated that she was "not concerned" that Kim Tucker's IRA accounts would be re-added to the list of properties to be forfeited. (Id.) Kim Tucker replied that she had spoken to an attorney who she was unable to retain, and was advised that she should file a petition as well: "The attorney I spoke with, but could not afford, said I should file one of those petitions as some of they money they are taking is my money unrelated to Scott." (Id.)

---

[1] These account numbers are publicly filed in the Preliminary Order of Forfeiture and elsewhere, and are part of the public record. (See, e.g., Docket # 336, 376.)

On February 21, 2019, the Court entered a First Final Order of Forfeiture, which included all right, title **[\*6]** and interest in the Midwest Account, the Schwab Account and the Aspen property. (Docket # 376.) The government states that the Schwab and Midwest accounts have since been liquidated and that the Aspen property has been placed on the market. (Docket # 433 at 5.)

On April 13, 2019, Kim Tucker, proceeding pro se, filed a petition asserting "a vested interest" in certain properties listed in the Final Order of Forfeiture, specifically asserting an interest in $1,000,000 of the funds deposited in the Schwab Account, all funds in the Midwest Account and $100,000 in the value of the Leawood, Kansas property. (Docket # 388.) She claimed that she contributed approximately $100,000 to purchase of the Leawood, Kansas property, and that a portion of the funds in the Charles Schwab Account and that all funds in the Midwest Account were earned through her own employment. (Id.) The petition did not claim an interest in the Aspen, Colorado property.

In an Order of July 19, 2019, the Court adopted a proposed discovery schedule on Kim Tucker's motion, with discovery specifically focused on Kim Tucker's interest in the Leawood, Kansas property. (Docket # 404.) The government took the deposition of Kim **[\*7]** Tucker on December 6, 2019. (Ravi Dec. Ex. T.)

After the close of discovery, Kim Tucker filed an amended petition. (Docket # 424.) That motion seeks 50 percent of proceeds from the Leawood, Kansas property; 50 percent of proceeds from the Aspen, Colorado property; and 50 percent of the value of the Charles Schwab and Midwest accounts. (Id.)

On March 3, 2020, the government filed a motion to dismiss the petition and amended petition, or, in the alternative, a motion for summary judgment in its favor. (Docket # 433.) Its motion included the notice required to a pro se party pursuant to *Local Civil Rule 56.1*. (Docket # 435.) Kim Tucker filed a response on April 22, 2020. (Docket # 438.)

The Court of Appeals for the Second Circuit affirmed Scott Tucker's judgment and conviction in a written decision dated June 2, 2020. *United States v. Grote, 961 F.3d 105 (2d Cir. 2020)*. The Mandate issued on October 22, 2020. (Docket # 440.) DISCUSSION.

I. The Petitions Are Dismissed as Untimely.

A. Legal Standard.

"It is . . . well settled that *section 853(n)* provides the exclusive means by which a third party may lay claim to forfeited assets ☐ after the preliminary forfeiture order has been entered." *DSI Assocs. LLC v. United States, 496 F.3d 175, 183 (2d Cir. 2007)*; see also *Libretti v. United States, 516 U.S. 29, 44, 116 S. Ct. 356, 133 L. Ed. 2d 271 (1995)* ("Once the Government has secured a stipulation as to forfeitability, third-party **[\*8]** claimants can establish their entitlement to return of the assets only by means of the hearing afforded

under *21 U.S.C. § 853(n)*."); *De Almeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006)* ("An ancillary proceeding [under *section 853(n)*] is evidently the only avenue for a post-indictment third-party claim to forfeited property ") (emphasis in original).

*Section 853(n)(1)* requires the government to publish notice of an order of forfeiture:

> Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

*21 U.S.C.A. § 853(n)(1)*. A third party who asserts a legal interest in property subject to forfeiture "may, within thirty days of the final publication of notice or his receipt of notice under *paragraph (1)*, whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property." *21 U.S.C. § 853(n)(2)*.

Where "a third party files a petition asserting an interest in the property to be forfeited, **[*9]** the court must conduct an ancillary proceeding . . . ." *Rule 32.2(c)(1)*. "In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason. For purposes of the motion, the facts set forth in the petition are assumed to be true." *Rule 32.2(c)(1)(A)*. "[A] motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under *Federal Rule of Civil Procedure 12(b)*. " *Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004)*.

A court may permit discovery as to the petitioner's claim, after which a party may move for summary judgment under *Rule 56, Fed. R. Civ. P. Rule 32.2(c)(1)(B)*. "Only after some discovery has taken place may a party move for summary judgment; at that point the petitioner would be required to produce evidence supporting a prima facie case of entitlement, but not before." *Pacheco, 393 F.3d at 352*. If the petition is not resolved through motion practice, it is to be adjudicated through a hearing. *Rule 32.2(c)(1)(B)*.

The petitioner has the burden to prove her legal right, title or interest in the property by a preponderance of the evidence. *21 U.S.C. § 853(n)(6)*; *United States v. Watts, 786 F.3d 152, 160 (2d Cir. 2015)*. Specifically, the petitioner must prove that "the right, title, or interest was vested in the petitioner rather than the defendant or was superior to **[*10]** any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section . . . ." *21 U.S.C. § 853(n)(6)(A)*.

B. The Petitions Are Dismissed as to the Midwest Account, the Charles Schwab Account and the Aspen Property.

As noted, on April 24, 2018, the government posted notice of the Amended Preliminary Order of Forfeiture to the website www.forfeiture.gov, which listed all property subject to forfeiture and advised third parties of their rights to commence an ancillary proceeding under *section 853(n)* and *Rule 32.2*. (Docket # 374.) It stated that any person wishing to commence an ancillary proceeding "must file an ancillary petition" within 60 days of April 24, 2018. (Id.) The notice remained posted online for 30 days, through May 23, 2018. (Id.) Kim Tucker disputes that she had any knowledge of the online publication or of the forfeiture.gov website. (Docket # 438 ¶ 17.)

The government separately sent copies of the notice to Kim Tucker via Federal Express to an address in Leawood, Kansas and a Post Office Box in Overland Park, Kansas. (Ravi Dec. Ex. H.) The cover letter, dated May 1, 2018, advised her that any petition under *section 853(n)* must be filed within 30 **[*11]** days of her receipt of actual notice or the final publication of notice (i.e., May 23, 2018). (Id.) Kim Tucker disputes that she received the notice addressed to the Post Office Box, and denies knowledge of the existence of the P.O. Box. (Docket # 438 ¶¶ 12-13.) On February 22, 2019, the Court entered a Final Order of Forfeiture, which included the forfeiture of all right, title and interest in the Midwest Account, the Schwab Account and the Aspen property. (Docket # 376.)

Kim Tucker's petition is untimely as to the Midwest Account, the Charles Schwab Account and the Aspen property. She filed the petition on April 3, 2019, more than ten months after the final date of publication of notice. The petition therefore falls beyond the statutory 30-day deadline to submit a petition to adjudicate the validity of her alleged interest in the properties. *21 U.S.C. § 853(n)(2)* (petition must be filed "within thirty days of the final publication of notice") (emphasis added); see also *DSI Assocs., 496 F.3d at 183* ("It is . . . well settled that *section 853(n)* provides the exclusive means by which a third party may lay claim to forfeited assets — after the preliminary forfeiture order has been entered.").

Judge Engelmayer dismissed a third party's ancillary petition **[*12]** on timeliness grounds in *United States v. Afriyie, 2017 U.S. Dist. LEXIS 204095, 2017 WL 6375781, at *4 (S.D.N.Y. Dec. 11, 2017)*. There, a third party moved to vacate a final order of forfeiture, well after publication of the preliminary orders of forfeiture and six months after the final order of forfeiture issued. *2017 U.S. Dist. LEXIS 204095, [WL] at *3-4*. Judge Engelmayer explained the *section 853(n)* provided the exclusive vehicle to vacate a forfeiture order, and concluded that "[b]ecause [the movant] failed to timely pursue a *§ 853(n)(2)* hearing, [it] may not now assert a legal interest in the forfeited property." *2017 U.S. Dist. LEXIS 204095, [WL] at *4*

Several courts of appeals, including the Second Circuit, have suggested or concluded that the failure to submit a petition within the 30-day period extinguishes a petitioner's right to commence an ancillary proceeding. See *United States v. Crew, 704 Fed. App'x 30, 32 (2d*

*Cir. 2017)* (petitioner "failed to file a petition asserting a legal interest in the property within 30 days 'of the final publication of notice or his receipt of notice,' or in fact ever, and he was therefore barred from intervening to challenge the forfeiture or order of sale.") (summary order); *United States v. Lamid, 663 Fed. App'x 319, 325 (5th Cir. 2016)* ("Courts have routinely held that the deadline in *section 853(n)(2)* is mandatory.") (summary order); *United States v. Marion, 562 F.3d 1330, 1339 (11th Cir. 2009)* ("A third party then has thirty days from the receipt of notice of the preliminary forfeiture order or the final publication of notice of the latter, **[\*13]** whichever is earlier, within which to petition the court for an ancillary hearing. The failure to file a petition within this thirty-day time period extinguishes a third- party's interests."). The advisory committee notes to *Rule 32.2(c)* similarly state that "if a third party has notice of forfeiture but fails to file a timely claim, his or her interests are extinguished, and may not be recognized when the court enters the final order of forfeiture."

The Court acknowledges, and accepts as true, Kim Tucker's assertion that she did not receive written notice sent to the Post Office Box in Overland Park, Kansas, and that she was unaware of such Post Office Box. (Docket # 438 ¶¶ 12-13.) The Court also accepts as true her assertion that she did not review the online publication of the notice of preliminary forfeiture and was unfamiliar with the forfeiture.gov website. (Id. ¶ 17.) This does not relieve her of the statutory obligation to submit a timely petition under *section 853(n)(2)*. The record reflects that Kim Tucker was attentive to the forfeiture proceedings and the potential forfeiture of assets in which she claimed ownership, including the IRA accounts that she successfully requested, through counsel to Scott **[\*14]** Tucker, to be excluded from the Preliminary Order of Forfeiture. (Ravi Dec. Ex. E; Tucker Dep. 68-70 (testifying that she discussed forfeited assets with Scott Tucker's counsel and the IRA accounts specifically).) At the latest, she had actual notice of the Preliminary Amended Order of Forfeiture in November 2018, when she e-mailed her inquiry to Scott Tucker's attorney. (Ravi Dec. Ex. K.)

The government's motion to dismiss the Petition and the Amended Petition as untimely will therefore be granted as to the claimed interest in the Charles Schwab Account, the Midwest Account and the Aspen property.

C. Kim Tucker Has Not Set Forth a Basis for Relief Under *Rule 60(b)*.

*Rule 60(b), Fed. R. Civ. P.*, provides that, on motion, the court "may relieve a party or its legal representative from a final judgment, order, or proceeding" for certain delineated reasons, including for excusable neglect.[2] Affording Kim Tucker special solicitude as a pro

---

[2] Other bases for *Rule 60(b)* relief include mistake, inadvertence, surprise, newly discovered evidence, fraud, satisfaction of judgment, or "any other reason that justifies relief," *Rule 60(b)(1)-(6)*, which courts have construed to require a showing of extraordinary circumstances. See,

se petitioner, the Court construes her petition as requesting relief under *Rule 60(b)* as an alternative basis to vacate or modify the Final Order of Forfeiture.

For the reasons largely explained, Kim Tucker's submissions do not set forth a basis for relief under *Rule 60(b)*. "[W]here a party fails to **[*15]** act with diligence, [s]he will be unable to demonstrate that [her] conduct constituted 'excusable neglect.'" *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 177 (2d Cir. 2004)*. The record demonstrates that Kim Tucker had notice of the properties listed the Preliminary Order of Forfeiture, and that, with the assistance of Scott Tucker's counsel, successfully attained modification to remove certain IRA accounts from the list of forfeited properties. Though she disputes that she received notice of the publication of the Amended Preliminary Order of Forfeiture, subsequent e-mails with Scott Tucker's counsel indicate her awareness of the forfeiture proceedings, as well as advice from an unretained attorney suggesting that she file a petition claiming an interest in certain properties.

Construing the submissions in favor of Kim Tucker in light of her status as a pro se litigant, the Court concludes that she has not made a showing of excusable neglect sufficient to warrant relief under *Rule 60(b)*.

II. The Petitions Are Dismissed as to the Leawood, Kansas Property.

A. The Petitions Were Not Timely Filed as to the Leawood Property.

The Leawood, Kansas property is in a somewhat different procedural position, as no final order of forfeiture has been entered. As noted, on **[*16]** June 11, 2018, the Court stayed execution of forfeiture of the Leawood property pending the outcome of Scott Tucker's appeal. (Docket # 358.) The Court entered the stay following the entry of the Amended Preliminary Order of Forfeiture and its publication. No final order of forfeiture has yet been filed as to the Leawood property.

For the reasons already explained, however, Kim Tucker's petitions are nevertheless untimely as to her claimed interest in the Leawood, Kansas property. The Leawood property was listed in the Amended Preliminary Order of Forfeiture, and it was listed in the government's online publication and the notice sent to Kim Tucker by the government. Kim Tucker's petition and amended petition were filed well after the 30-day period to petition for an ancillary proceeding. *21 U.S.C. § 853(n)(2)*; see also *Afriyie, 2017 U.S. Dist. LEXIS 204095, 2017 WL 6375781, at *4*; *Crew, 704 Fed. App'x at 32*. That the final order of forfeiture has not yet been entered does not alter the timeliness analysis. See *Rule 32.2(c)*, Advisory Committee Notes ("if a third party has notice of forfeiture but fails to

e.g., *Gonzalez v. Crosby, 545 U.S. 524, 535, 125 S. Ct. 2641, 162 L. Ed. 2d 480 (2005)*. None of these alternative bases for relief plausibly applies to Kim Tucker's petitions.

file a timely claim, his or her interests are extinguished, and may not be recognized when the court enters the final order of forfeiture").

The petitions' claims as to the Leawood property are therefore **[\*17]**  dismissed.

B. <u>The Government's Summary Judgment Motion Is Granted as to the Leawood Property</u>.

Even if the petitions were timely filed as to the Leawood property, the government has come forward with evidence that no reasonable finder of fact could find that Kim Tucker has a legally cognizable interest in the property that is superior to that of Scott Tucker. In opposition, Kim Tucker does not point to evidence that would permit a finder of fact to conclude that she has a superior ownership interest in the Leawood property. The defendant's summary judgment motion will therefore be granted as to the Leawood property.

As noted, a party may move for summary judgment after the conclusion of discovery in an ancillary proceeding. *Rule 32.2(c)(1)(B)*. Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rule 56(a), Fed. R. Civ. P.* A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against **[\*18]**  the movant." *Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014)* (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)*. If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009)*. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004)* (quoting *Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993))*. A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (citation omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of

fact for trial in **[\*19]** order to avoid summary judgment." *Cordiano, 575 F.3d at 204* (internal citation omitted).

To be entitled to relief, Kim Tucker must prove by a preponderance of the evidence that she "has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section." *21 U.S.C. § 853(n)(6)(A)*.

Kim Tucker's first petition claims an interest in $100,000 of the Leawood property and her second petition claims a 50% interest in the property. In her response to interrogatories submitted by the government, she asserts that her interest in the property "is both financial and marital," and is supported by Kansas marital law. (Ravi Dec. Ex. S at 1.) She also asserts that she personally "paid construction costs on numerous occasions," totaling $1,745,332, and lists assorted dates, vendors and amounts contributed. (Ravi Dec. Ex. S at 1-7.)

In her deposition taken by the government, Kim Tucker acknowledged that in proceedings **[\*20]** with the Federal Trade Commission, she stated that the Leawood property had been purchased with money earned by Scott Tucker. (Ravi Dec. Ex. T at 116-17.) In those FTC proceedings, she stated in a sworn interrogatory "that the source of funding for the purchase[] of the residence in Leawood, Kansas . . . were monies earned by her husband Scott Tucker " (Ravi Dec. Ex. V at Response 7.) In her deposition, she testified that her statement to the FTC was only "partially accurate" and "not completely accurate," and testified that "[i]t's inaccurate in that some of the money that was used to purchase the house was money earned by me" and that "[a] portion of the funds that were used to build the house were from my earnings." (Ravi Dec. Ex. T at 117-18, 120.) Kim Tucker also testified that she did not know what portion of the house was constructed from her earnings. (Id. at 119-20.).

Thus, Kim Tucker has expressly stated, in a sworn submission to the FTC, that monies earned by Scott Tucker were the source of funding for the Leawood, Kansas property. Though she now claims that she in fact contributed to the property, she has not pointed to financial records or other evidence that would tend to show that **[\*21]** her right, title or interest in the Leawood property is superior to Scott Tucker's. A party may not defeat a summary judgment motion based on conclusory, unsupported statements that contradict their prior sworn testimony. See, e.g., *In re: Fosomax Prods. Liability Litig., 707 F.3d 189, 193 (2d Cir. 2013)*; *Philpott v. State Univ. of New York, 805 Fed. App'x 32, 34 (2d Cir. 2020)* ("Conclusory statements and affidavits that contradict the party's previous sworn testimony cannot defeat summary judgment.") (internal citations and quotation marks

omitted). The Court therefore concludes that the government has pointed to evidence that entitles it to relief as a matter of law, and that, in opposition, Kim Tucker has not pointed to evidence from which a reasonable trier of fact could rule in her favor. Summary judgment is therefore warranted as to her claimed right to the Leawood property.

In addition, in her interrogatory responses, Kim Tucker stated that the source of her funds spent on the Leawood property were derived from $2,645,186 in total income from payday lending businesses owned by Scott Tucker, except for $47,218 in proceeds from the sale of a home she purchased before her marriage. (Ravi Dec. Ex. S at 9-10.) The government states that Kim Tucker did not produce any records reflecting the source of her income, and she has [*22] submitted none in opposition to the motion. (Govt. Mem. at 28 n. 11.) However, assuming the accuracy of Kim Tucker's figures and statements, they are nevertheless evidence that the Leawood property was purchased with revenue obtained through the criminal activities of Scott Tucker. Drawing every reasonable inference in favor Kim Tucker as the non-movant, a reasonable trier of fact could not rule in her favor on the *section 853(n)* petition.

The government's motion for summary judgment will therefore be granted.

CONCLUSION.

The government's motion is GRANTED in its entirety. The petitions of Kim Tucker are dismissed. The Clerk is directed to terminate the motion and the amended petition. (Docket # 424, 431.)

SO ORDERED.

/s/ P. Kevin Castel

P. Kevin Castel

United States District Judge

Dated: New York, New York

November 24, 2020

---

**End of Document**

 Neutral

As of: March 14, 2025 7:28 PM Z

## *United States v. Mosca*

United States Court of Appeals for the Second Circuit

October 16, 2023, Decided

21-1209 (L), 21-1271 (Con), 21-2585 (Con), 22-223 (Con), 22-701 (Con)*

**Reporter**

2023 U.S. App. LEXIS 27382 *; 2023 WL 6799293

United States of America, Appellee, v. Jason Mosca, AKA Stan, AKA Walter, AKA Jeff, AKA Jay, Jarret Stretch, AKA John Murphy, Michael Scott Schutzman, AKA Mike Scott, AKA Steve Burman, AKA Dennis, AKA Josh Tyler, AKA Todd Evans, Defendants, Michael Romano, William Kearney, AKA Ed Thompson, AKA George, Defendants-Appellants, Karen Kearney, Jeanne Romano, Movants-Appellants.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [*1]** Appeal from a judgment and orders of the United States District Court for the Eastern District of New York (Dora Irizarry, Judge; Vera M. Scanlon, Magistrate Judge).

*United States v. Romano, 2021 U.S. Dist. LEXIS 82465, 2021 WL 1711633 (E.D.N.Y., Apr. 29, 2021)*

## Core Terms

forfeiture, district court, third-party, cases, petitions

## Case Summary

### Overview

HOLDINGS: [1]-The district court did not err when it found that defendants A and B engaged in a telemarketing scheme where the conduct for which the defendants were convicted was not generic illegal services or unlawful activities, but rather a kind of conduct specifically enumerated in *18 U.S.C.S. § 981(a)(2)(A)*. The scheme in this case involved the sale of gold coins; a lawful good.

---

* 21-1209 (L) was withdrawn by order filed January 10, 2022.

**Outcome**

Orders affirmed in part, vacated in part; remanded.

**LexisNexis® Headnotes**

Criminal Law & Procedure > ... > Appeals > Standards of Review > Clear Error Review

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Conclusions of Law

Criminal Law & Procedure > Sentencing > Forfeitures > Proceedings

*HN1*[⬇] **Standards of Review, Clear Error Review**

In a forfeiture context, the appellate court reviews the district court's legal conclusions de novo and its factual findings for clear error.

Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act
Business & Corporate Compliance > Communications, Satellite Transmissions & Telecommunications > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

*HN2*[⬇] **Federal Acts, Telemarketing & Consumer Fraud & Abuse Prevention Act**

Cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, trigger *18 U.S.C.S. § 981(a)(2)(A)* whereas cases involving lawful goods or lawful services that are sold or provided in an illegal manner are covered by *18 U.S.C.S. § 981(a)(2)(B)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Criminal Law & Procedure > Sentencing > Forfeitures > Defenses

Criminal Law & Procedure > Sentencing > Forfeitures > Proceedings

*HN3*[⤓]  **Motions to Dismiss, Failure to State Claim**

Third party claims to assets seized at forfeiture are governed by *21 U.S.C.S. § 853* and *Fed. R. Crim. P. 32.2(c)*. The appellate court applies the normal rules of civil procedure to petitions under *21 U.S.C.S. § 853* and consider them under the familiar *Fed. R. Civ. P. 12(b)(6)* standard. To survive a motion to dismiss, a petition must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face.

Criminal Law & Procedure > Sentencing > Forfeitures > Defenses

*HN4*[⤓]  **Forfeitures, Defenses**

To state a plausible claim under *21 U.S.C.S. § 853(n)(6)(A)*, a third party must state that she has a legal right, title, or interest in the property that was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property. *21 U.S.C.S. § 853(n)(6)(A)*. Partial forfeiture is possible when property interests of third parties are at stake.

Real Property Law > Estates > Concurrent Ownership > Tenancies by Entireties

Real Property Law > Estates > Concurrent Ownership > Tenancies in Common

*HN5*[⤓]  **Concurrent Ownership, Tenancies by Entireties**

In New York, married couples generally own their homes in a tenancy by the entirety. A tenancy by the entirety may be converted into a tenancy in common only under certain conditions, including by joint conveyance or divorce, at which point a spouse will own their share as a tenant in common. Under a tenancy-in-common, cotenants each possess an equal right to enjoy the whole property.

Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > Restitution

Estate, Gift & Trust Law > Trusts > Constructive Trusts

Real Property Law > Trusts > Constructive Trusts

Evidence > Burdens of Proof > Clear & Convincing Proof

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Remedies

## *HN6*[⬇] **Causes of Action & Remedies, Restitution**

Under Florida law, a constructive trust is an equitable remedy that converts a title holder into a trustee when property has been acquired by fraud, or where, though acquired originally without fraud it is against equity that it should be retained by him who holds it. Courts may impose a constructive trust where there is clear and convincing proof of (1) a promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship, and (4) unjust enrichment.

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > In Personam Actions

Criminal Law & Procedure > Sentencing > Forfeitures > Proceedings

## *HN7*[⬇] **In Rem & Personal Jurisdiction, In Personam Actions**

Criminal forfeiture is an in personam action in which only the defendant's interest in the property may be forfeited.

**Counsel:** FOR APPELLEE: Kevin Trowel, Diane C. Leonardo, Assistant United States Attorneys, for Breon Peace, United States Attorney for the Eastern District of New York, Central Islip, NY.

Michael Romano, DEFENDANT-APPELLANT, Pro se, Fairton, NJ.

William Kearney, DEFENDANT-APPELLANT, Pro se, Lindenhurst, NY.

Karen S. Kearney, MOVANT-APPELLANT, Pro se, East Islip, NY.

FOR MOVANT-APPELLANT JEANNE ROMANO: Matthew Gilmartin, North Olmsted, OH.

**Judges:** PRESENT: DEBRA ANN LIVINGSTON, Chief Judge, BETH ROBINSON, MARIA ARAÚJO KAHN, Circuit Judges.

## Opinion

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order of the district court on defendants' forfeiture is **AFFIRMED**. It is further **ORDERED** that the district court orders for third party petitions are **VACATED and REMANDED**.

William Kearney and Michael Romano, proceeding *pro se*, appeal the district court's order which adopted the magistrate judge's report and recommendation on forfeiture. Jeanne Romano, through counsel, and Karen Kearney, proceeding *pro se*, separately appeal **[*2]** district court orders granting the Government's motions to dismiss their third-party forfeiture petitions under *21 U.S.C. § 853* in which they claimed a legal interest in certain real property subject to forfeiture. We assume the parties' familiarity with the underlying facts and the issues on appeal, as well as our prior decision on the initial direct appeal. *See generally United States v. Romano, 794 F.3d 317 (2d Cir. 2015)*.

## I. Mail and Wire Fraud Conspiracy Forfeiture

*HN1*[⬆] In a forfeiture context, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Daugerdas, 892 F.3d 545, 552 (2d Cir. 2018)*.

The appellants' main argument is that the district court incorrectly ordered gross-proceeds forfeiture under *18 U.S.C. § 981(a)(2)(A)* instead of net-proceeds forfeiture under *18 U.S.C. § 981(a)(2)(B)*. *HN2*[⬆] "[C]ases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes," trigger *subsection (A)* whereas "cases involving lawful goods or lawful services that are sold or provided in an illegal manner" are covered by *subsection (B)*. The Defendants rely on cases finding a clear distinction between *subsection (A)*, which is appropriate for cases involving inherently unlawful activities, and *subsection (B)*, which is generally appropriate in cases in which lawful goods or services were sold or provided in an unlawful manner. **[*3]** *See United States v. Bodouva, 853 F.3d 76, 79-80 (2d Cir. 2017)* (per curiam). Because the scheme in this case involved the sale of gold coins—a lawful good—the Defendants argue that *subsection (B)* applies. We disagree.

The cases relied on by the Defendants do not address the key language in *subsection (A)*: cases "involving . . . telemarketing . . . schemes." The conduct for which the defendants were convicted was not generic "illegal services [or] unlawful activities," but rather a kind of conduct specifically enumerated in *subsection (A)*. The district court did not err when it found that William Kearney and Michael Romano engaged in a telemarketing scheme.

Accordingly, since the conduct in question fell within the specific language of *subsection (A)*, we affirm the district court's order of gross proceeds forfeiture.[1]

## II. Third-Party Claims

We also conclude that Karen Kearney and Jeanne Romano's third-party petitions were dismissed prematurely. *HN3*[⬆] Third party claims to assets seized at forfeiture are governed by *21 U.S.C. § 853* and *Fed. R. Crim. P. 32.2(c)*. We apply the normal rules of civil procedure to petitions under *§ 853* and consider them under the familiar *Fed. R. Civ. P. 12(b)(6)* standard. *Daugerdas, 892 F.3d at 552*. To survive a motion to dismiss, a petition "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (internal quotation **[*4]** marks omitted).

*HN4*[⬆] To state a plausible claim under *§ 853(n)(6)(A)*, a third party must state that she "has a legal right, title, or interest in the property" that "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." *21 U.S.C. § 853(n)(6)(A)*. We have held that partial forfeiture is possible when property interests of third parties are at stake. *See Pacheco v. Serendensky, 393 F.3d 348, 354-55 (2d Cir. 2004)*.

Karen Kearney and Jeanne Romano's ownership interests at forfeiture are determined by state law. *See United States v. Watts, 786 F.3d 152, 161 (2d Cir. 2015)*. With respect to Karen Kearney's home, the district court presumed, without deciding, that the Government obtained an interest superior to Karen Kearney's interest and the interest of her ex-husband, one of the defendants in this case. In her counseled petition and *pro se* opposition to the Government's motion, Karen Kearney argued that she had a separate vested interest and a superior interest under New York law.

*HN5*[⬆] In New York, married couples generally own their homes in a tenancy by the entirety. *See Citibank, N.A. as Tr. of NRZ Pass-Through Tr. VI v. Gifford, 204 A.D.3d 1382, 168 N.Y.S. 3d 192, 195 (N.Y. App. Div. 2022)*; *see also N.Y. EST. POWERS & TRUSTS LAW § 6-2.2(b)* (McKinney 2019). A tenancy by the entirety may be converted into a tenancy in common only under certain conditions, **[*5]** including by joint conveyance or divorce, at which point a spouse will own their share as a tenant in common. *In re Est. of Violi, 65 N.Y.2d 392, 395, 482 N.E.2d 29, 492 N.Y.S.2d 550 (1985)*. Karen Kearney divorced her husband in September 2020. Under a tenancy-in-common,

---

[1] Therefore, we do not reach the district court's holding that the forfeiture was also proper under *18 U.S.C. § 982* for property involved in the money laundering conspiracy for which defendants were convicted.

cotenants each possess an equal right to enjoy the whole property. *See Myers v. Bartholomew, 91 N.Y.2d 630, 632-33, 697 N.E.2d 160, 674 N.Y.S.2d 259 (1998)*.

In the circumstances here, the mere fact that the property was bought in part with tainted funds would not necessarily preclude Karen Kearney from plausibly stating a superior ownership interest in her own share of the property under New York law as either a tenant by the entirety or a tenant in common, whichever applies. *See, e.g., United States v. Bangiyeva, 75 F.4th 445, 456-58 (4th Cir. 2023)* (describing property rights of an innocent spouse who holds property in a tenancy by the entirety). Under New York law, Karen Kearney plausibly asserted a claim that she had a property interest that was vested in her rather than the defendant. Binding case law does not preclude the plausibility of her claim. Accordingly, we vacate and remand the order dismissing Karen Kearney's third-party petition.

Jeanne Romano's petition was also dismissed prematurely. *HN6*[⬆] Under Florida law, a constructive trust is an equitable remedy that converts a title holder into a trustee when property "has been acquired **[*6]** by fraud, or where, though acquired originally without fraud it is against equity that it should be retained by him who holds it." *Maio v. Clarke, 255 So.3d 369, 371 (Fla. Dist. Ct. App. 2018)* (quoting *Provence v. Palm Beach Taverns, Inc., 676 So.2d 1022, 1025 (Fla Dist. Ct. App. 1996)*). "[C]ourts may impose a constructive trust where there is clear and convincing proof of (1) a promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship, and (4) unjust enrichment." *Bank of Am. v. Bank of Salem, 48 So.3d 155, 158 (Fla. Dist. Ct. App. 2010)* (internal quotation marks and citation omitted).

Jeanne Romano filed a third-party petition asserting that she paid for her home with the help of a 2003 mortgage and the approximately $143,000 in funds that she received from her son as a loan for home improvements but that she subsequently repaid. She asserts that she has continued to pay all expenses on the property. Jeanne Romano later transferred the title, on the advice of counsel, to Michael Romano in what counsel advised her to be a constructive trust. The district court dismissed Jeanne Romano's petition reasoning that she failed to state plausibly an interest in the property, thus apparently discrediting the credibility of these assertions. Accepting Jeanne Romano's petition as true, as we must, she plausibly stated the terms of a constructive trust under **[*7]** Florida law, including that it would be "against equity" for Michael Romano to retain possession of the property in order to satisfy part of his forfeiture. *Silva v. de la Noval, 307 So.3d 131, 134 (Fla. Dist. Ct. App. 2020)*.

Jeanne Romano has also plausibly pleaded that she has a superior interest in the property. Revised Final Order of Forfeiture, 1, February 18, 2022; *Daugerdas, 892 F.3d at 548* ("*HN7*[⬆] [C]riminal forfeiture is an *in personam* action in which only the defendant's

interest in the property may be forfeited.") (citation omitted). If the district court determines that Jeanne Romano has standing, the district court must determine what interest Michael Romano had in the property under Florida law. We therefore vacate and remand the order dismissing Jeanne Romano's third-party petition.

We have considered the parties' remaining arguments and find them to be without merit or unavailing. Accordingly, we **AFFIRM** the order of the district court on defendants' forfeiture, **VACATE** orders dismissing the third-party petitions, and **REMAND** for further proceedings.

---

End of Document


Neutral
As of: March 14, 2025 7:26 PM Z

# *United States v. Romano*

United States District Court for the Eastern District of New York

February 2, 2022, Decided; February 2, 2022, Filed

09-cr-00168 (S-2) (DLI) (VMS)

**Reporter**

2022 U.S. Dist. LEXIS 19142 *; 2022 WL 307792

UNITED STATES OF AMERICA,-against-MICHAEL ROMANO, et. al., Defendants.

**Prior History:** *United States v. Romano, 859 F. Supp. 2d 445, 2012 U.S. Dist. LEXIS 62435 (E.D.N.Y., May 3, 2012)*

## Core Terms

Forfeiture, purchase of property, legal interest, forfeiture of property, constructive trust, motion to dismiss, vested, magistrate judge, third party, adjudicate, ancillary, forfeited, proceeds, self-serving, declaration, recommended, ownership, commit

**Counsel:** **[*1]** For Karen Kearney, Interested Party: Andrew J. Campanelli, LEAD ATTORNEY, Campanelli & Associates, P.C., Merrick, NY.

For USA, Plaintiff: Alicyn L. Cooley, LEAD ATTORNEY, United States Attorney's Office, Brooklyn, NY USA; Lara Treinis Gatz, Lara Treinis Gatz, LEAD ATTORNEYS, United States Attorneys Office, Central Islip, NY; Drew Godfrey Rolle, United States Attorney's Office, Brooklyn, NY.

**Judges:** DORA L. IRIZARRY, United States District Judge.

**Opinion by:** DORA L. IRIZARRY

**Opinion**

## MEMORANDUM AND ORDER

**DORA L. IRIZARRY, United States District Judge**:

On May 19, 2021, nonparty Jeanne Romano ("Petitioner"), pursuant to *21 U.S.C. § 853(n)*, filed a Verified Petition (the "Petition") for a hearing to adjudicate the validity of her claim to a residence located at 8154 Via Bolzano, Lake Worth, Florida (the "Property"), which is

subject to forfeiture as part of Defendant Michael Romano's ("Defendant") sentence. *See*, *generally*, Verified Pet. for Hearing to Adjudicate Third Party Claim ("Pet."), Dkt. Entry No. 587. On January 21, 2022, the Government moved to dismiss the Petition. *See*, Gov't's Mem. of Law in Supp. of Mot. to Dismiss the Petition ("Gov't Mem."), Dkt. Entry No. 613-1. Petitioner opposed the motion. *See*, Pet'r's Mem. of Law in Opp'n **[*2]** to the Mot. to Dismiss ("Opp'n"), Dkt. Entry No. 613. The Government replied. *See*, Gov't Reply Mem. of Law ("Reply"), Dkt. Entry No. 615. For the reasons set for below, the Government's motion is granted.

## BACKGROUND

Petitioner, the mother of Defendant, filed the Petition *pro se*, but later retained counsel to represent her in this matter. *See*, Not. of Appearance of Matthew Gilmartin, Dkt. Entry No. 601. The Court assumes the parties' familiarity with the facts and procedural history of this case. Thus, only those facts necessary for this Memorandum and Order are set forth herein.[1] On November 10, 2010, a second superseding indictment, returned by a grand jury of this district, was filed against Defendant and other named individuals, charging them with conspiracy to commit mail and wire fraud from December 1990 to November 2008, in violation of *18 U.S.C. § 1349* and conspiracy to commit money laundering from March 1997 to November 2008, in violation of *18 U.S.C. §§ 1956(a)(1)(A)(i)*, *1956(h)*, *1957(b)*, and *1957(d)(1)*. *See*, Second Superseding Indictment ("Indictment"), Dkt. Entry No. 168. Each of these counts was accompanied by a criminal forfeiture allegation. *Id.* at ¶¶ 21-23. On June 13, 2011, Defendant was convicted after a five-week jury trial of conspiracy **[*3]** to commit mail and wire fraud and conspiracy to commit money laundering. *See*, Jury Verdict, Dkt. Entry No. 295. As part of Defendant's sentence, the Government requested forfeiture of Defendant's assets, including the Property. *See*, Mot. for Forfeiture, Dkt. Entry No. 355.

By separate Report and Recommendations ("R&Rs") issued on July 26, 2013 and December 17, 2013, respectively, the magistrate judge recommended that the Court grant the Government's requests for forfeiture and restitution orders. *See*, Forfeiture R&R dated July 26, 2013, Dkt. Entry No. 373; Restitution R&R dated December 17, 2013, Dkt. Entry No. 393. The magistrate judge found that the Government had shown by a preponderance of evidence that the Property was among Defendant's assets traceable to the commission of the mail and wire fraud and, thus, recommended that the Property be forfeited to the United States. *See*, Forfeiture R&R at 40-44. In particular, the magistrate judge found that

---

[1] For a more complete recitation of the facts and procedural history, *see United States v. Romano, 859 F. Supp.2d 445, 451 (E.D.N.Y. 2012)*, *aff'd*, *794 F.3d 317 (2d Cir. 2015)*, and Memorandum and Order issued on April 29, 2021, Dkt. Entry No. 556.

Defendant had transferred $142,630 from one of his bank accounts to Villages of Windsor by Ansca for the purchase of the Property. *See*, Forfeiture R&R at 41.

The magistrate judge recommended that the district court order forfeiture **[*4]** of the Property in its entirety, rather than just the $142,630 amount contributed to the purchase of the Property and traceable to Defendants' criminal activities. *Id.* at 40-44. The magistrate judge reached this conclusion after extensively analyzing persuasive case law from other circuits and finding that, in the absence of the "tainted money," Defendant either was unable to purchase the Property or the purchase would have been substantially more difficult. *Id.* at 42-43. Leading up to the Forfeiture R&R, Defendant never contested the forfeitability of the Property or that the proceeds from the fraud contributed to the purchase of the Property. *Id.* at 42. However, in his objection to the Forfeiture R&R, Defendant, *inter alia*, mentioned that he had received the title of the Property from Petitioner "as a gift" in December 2007. *See*, Obj. to Forfeiture R&R, Dkt. Entry No. 375, at 2-3. The objection did not discuss whether Defendant must return the Property to Petitioner at her request.

The Honorable Sterling Johnson, Jr., Senior United States District Judge, then presiding over this matter, adopted the R&Rs without opinion and issued the original forfeiture and restitution orders. *See* **[*5]** , Minute Entry dated February 27, 2014; Original Forfeiture Order issued on March 21, 2014, Dkt. Entry No. 402. On April 22, 2014, Petitioner filed an initial petition to amend the original forfeiture order, claiming an ownership interest in the Property based on a purported constructive trust. *See*, Dkt. Entry No. 410. However, the initial petition was not adjudicated as Defendant had appealed his conviction and sentence, and the decision on the appeal was pending. *See*, Not. of Appeal, Dkt. Entry No. 405.

On appeal, the Second Circuit Court of Appeals affirmed Defendant's judgment of conviction but vacated the forfeiture and restitution orders, and remanded them to this Court for *de novo* review of the R&Rs and the issuance of an opinion upon such review. *See*, *United States v. Romano, 794 F.3d 317, 340-41 (2d Cir. 2015)*. On April 29, 2021, upon *de novo* review, this Court adopted the R&Rs in their entirety, and, *inter alia*, ordered the seizure of Defendant's various bank accounts and forfeiture of the Property. *See*, Memorandum and Order ("M&O"), Dkt. Entry No. 556, at 8-12, 18; *See also*, Preliminary Order of Forfeiture Issued on May 27, 2021, Dkt. Entry No. 574.

On July 28, 2021, Petitioner filed the instant Petition, seeking to amend the Preliminary **[*6]** Order of Forfeiture and a hearing to adjudicate her claim to the Property under *21 U.S.C. § 853(n)*. *See*, *generally*, Pet. Petitioner asserts that she "contracted to purchase the Property in 2003" and borrowed $175,000 from Chase Manhattan Bank ("Chase Bank"). *Id.* at □ 1. Prior to closing the purchase of the Property, Defendant "advanced" Petitioner about $143,000 "for renovation and upgrades to the Property." *Id.* at

☐ 2. According to Petitioner, by 2007, Petitioner repaid both Chase Bank and Defendant, and she has paid all taxes, bills, and upkeep costs from 2003 to the date of the Petition. *Id.* at ☐☐ 3, 5. She never has lived in the Property, which she has rented out since purchasing it. *Id.* at ☐ 4.

Petitioner claims that, around May 2007, she gave the title of the Property to Defendant with his oral agreement that she retained the right to sell the Property to a third party in the future. *Id.* at ☐ 6. Petitioner further claims that Domenick Pelle ("Pelle"), "a longtime family friend and attorney," advised Petitioner that this transaction between her and Defendant constituted "a constructive trust." *Id.* According to Petitioner, she transferred the title of the Property to Defendant "for no consideration" **[*7]** and Defendant understood that Petitioner maintained "an equitable ownership" in the Property. *Id.* at ☐☐ 9-10. The Petition did not include any papers signed by either Petitioner or Defendant capturing this understanding at the time the purported conveyance of the Property took place.

In support of the Petition, Petitioner attached a declaration from her daughter Celia Wells ("Wells"). *See*, Decl. of Celia Wells ("Wells Decl."), Dkt. Entry No. 587. According to Wells, in 2007, Petitioner, Defendant, Pelle, and Wells had a meeting where Petitioner gave the Property to Defendant with the understanding that Defendant would return the Property if Petitioner asked for it. *Id.* Pelle also submitted a declaration in support of the Petition. *See also*, Decl. of Domenick A. Pelle ("Pelle Decl."), Dkt. Entry No. 587. Pelle claims he had advised Petitioner that the conveyance of the Property with the promise that Defendant would return the Property to her upon her demand created a constructive trust enforceable under New York law. *Id.* Defendant did not provide a declaration or an affidavit in support of the Petition.

On January 21, 2022, the Government moved to dismiss the instant Petition, contending **[*8]** that Petitioner lacks standing to bring the Petition as she does not have a legal interest in the Property. *See*, *generally*, Gov't Mem. Petitioner countered that she has articulated a sufficient claim to the Property and standing to bring an ancillary proceeding under *21 U.S.C. § 853(n)*. *See*, *generally*, Opp'n.

## LEGAL STANDARD

Any third party "asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of [her] alleged interest in the property." *21 U.S.C. § 853(n)(2)*. The petition, which is sworn and signed by the petitioner, "shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts

supporting the petitioner's claim, and the relief sought." *Id.* at *§ 853(n)(3)*. "Property" here includes "tangible and intangible personal property, including rights, privileges, interests, claims and securities." *United States v. Singh, 390 F.3d 168, 189 (2d Cir. 2004)* (quoting *21 U.S.C. § 853(b)(2)*).

"At the hearing, the petitioner must first establish [her] standing to challenge the forfeiture order by demonstrating a 'legal interest' **[\*9]** in the forfeited property under *§ 853(n)(2)*." *United States v. Watts, 786 F.3d 152, 160 (2d Cir. 2015)* (citations omitted). The petitioner then must "prove [her] entitlement to relief on the merits by establishing, through a preponderance of the evidence, one of two superior claims to the property under *§ 853(n)(6)*." *Id.* (citing *21 U.S.C. § 853(n)(6)*; *Pacheco v. Serendensky, 393 F.3d 348, 351 (2d Cir. 2004)*). The petitioner must demonstrate that she "has a legal right, title, or interest in the property, . . . [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." *21 U.S.C. § 853(n)(6)(A)*. The petitioner must demonstrate that she "is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." *Id.* at *§ 853(n)(6)(B)*.

"The procedures governing ancillary proceedings under *§ 853(n)* are further elaborated in *Rule 32.2(c) of the Federal Rules of Criminal Procedure*." *Watts, 786 F.3d at 161*. Where "a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding." *Fed. R. Crim. P. 32.2(c)(1)*. However, without holding a formal hearing, the "court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, **[\*10]** or for any other lawful reason." *Id.* at *32.2(c)(1)(A)*. "A motion to dismiss a third party petition should be treated like a motion to dismiss a civil complaint under *Federal Rule of Civil Procedure 12(b)*." *Watts, 786 F.3d at 161* (internal quotation marks and citation omitted). "To survive a motion to dismiss, the petition need only 'state [ ] enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Willis Mgmt. (Vt.), Ltd. v. United States, 652 F.3d 236, 241-42 (2d Cir. 2011)* (alternation in original)). Although the petition need not contain "detailed factual allegations," simple "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).

## DISCUSSION

In order to establish standing to challenge an order of forfeiture under *21 U.S.C. § 853(n)*, Petitioner must demonstrate that she has a legal interest in the forfeited property. *See*,

*Watts, 786 F.3d at 161* (citations omitted). Petitioner claims that she has a legal interest in the Property because, when she transferred the title of the Property to Defendant in 2007, she did so under the terms of a constructive trust. *See*, Pet. at □□ 6-12; *See also*, Opp'n at □□ 8-10. However, Petitioner's claim relies on her own self-serving statements and improper statements from her daughter and "a longtime family friend and attorney." Pet. at **[*11]** □ 6; *See also*, Wells Decl.; Pelle Decl. As an initial matter, Pelle's statement or belief that Petitioner's conveyance of the Property to Defendant constituted a constructive trust under New York law is immaterial and has no bearing on the issues before this Court. *See*, Pelle Decl. Additionally, the Court fails to see the significance of Wells' declaration. Wells only can attest to what her understanding of the transaction between Petitioner and Defendant was, which has no relevance to the issues at hand. *See*, Wells Decl.

The Petition states that, during a discussion at some point in May 2007, Petitioner orally conveyed the title of the Property to Defendant while maintaining "an equitable ownership" in the Property, thereby creating a constructive trust and retaining her legal interest in the Property. *See*, Pet. at □□ 6-9. This self-serving assertion is insufficient to allege a legal interest in the Property. *See*, *Kleiman v. Kings Point Cap. Mgmt., LLC, 2020 U.S. Dist. LEXIS 186424, 2020 WL 7249441, at *11 (E.D.N.Y. Sept. 30, 2020)*, *report and recommendations adopted*, *2020 U.S. Dist. LEXIS 223473, 2020 WL 7021648 (E.D.N.Y. Nov. 30, 2020)* (holding that information set forth in a party's self-serving affidavit is inappropriate for the court to consider at the motion to dismiss stage); *See also*, *Diaz v. Loc. No. 241, Transp. Workers Union of Am., Univ. Div., 2019 U.S. Dist. LEXIS 134398, 2019 WL 3765924, at *4 (S.D.N.Y. Aug. 9, 2019)* (holding that a party's self-serving statements in an exhibit are inappropriate **[*12]** for the court to consider on a motion to dismiss). The Petition's self-serving nature is especially concerning because Petitioner did not obtain a declaration from Defendant to establish the existence of the constructive trust. Indeed, in his objection to the Forfeiture R&R, Defendant noted that Petitioner had given him the Property as a gift, but failed to mention that she did so under the terms of a constructive trust. *See*, Obj. to Forfeiture R&R at 2-3. Thus, the Court finds that the Petition lacks sufficient factual allegations to allege Petitioner's legal interest in the Property.

Moreover, notwithstanding whether Petitioner sufficiently has alleged her legal interest in the Property, the Petition must be denied for failure to allege her superior interest in the Property. Establishing the proper standing to bring a petition is just the first step under *21 U.S.C. § 853(n)*. *See*, *Watts, 786 F.3d at 160*. In order to overturn the forfeiture of the Property, Petitioner must show that she can prevail on the merits under *21 U.S.C. § 853(n)(6)(A)* or *(B)*. *Id.*

Petitioner brings the instant Petition pursuant to *21 U.S.C. § 853(n)(6)(A)*. *See*, Opp'n at □□ 13-14. To establish a claim to property subject to forfeiture under *§ 853(n)(6)(A)*,

Petitioner must demonstrate that she "has a legal right, title, **[\*13]** or interest in the property . . . [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant *at the time of the commission of the acts* which gave rise to the forfeiture of the property." *21 U.S.C. § 853(n)(6)(A)* (emphasis added). "Subsection 853(n)(6)(A) works hand in hand with the 'relation-back' doctrine embodied in *§ 853(c)*, which provides that all property subject to forfeiture based on a criminal offense 'vests in the United States upon the commission of the [offense].'" *Watts, 786 F.3d at 166* (quoting *21 U.S.C. § 853(c)* (alteration in original)). Since forfeitable property vests in the Government "immediately upon the commission of a criminal act, a third party may prevail under *§ 853(n)(6)(A)* only by establishing that [s]he had a legal interest in the forfeited property *before* the underlying crime was committed—that is, before the government's interest vested." *Id.* (internal quotation marks and citation omitted) (emphasis in original).

The Court has adopted the magistrate judge's finding that proceeds from Defendant's fraud contributed to the purchase of the Property. *See*, M&O at 12; *See also*, Forfeiture R&R at 40-44. The magistrate judge specifically found that Defendant transferred $142,630 from one of his bank accounts **[\*14]** to Villages of Windsor by Ansca for the purchase of the Property. *See*, Forfeiture R&R at 41. Petitioner now claims that, "[w]hile her son arranged the purchase [of the Property], all he provided were funds for renovation and upgrading the premises before closing." Opp'n at ⬜ 6. However, whether Petitioner directly used Defendant's money for the purchase of the Property is inconsequential for criminal forfeiture analysis. In the fraud and money laundering context involving the forfeiture of real property, as is the case here, "courts have held that property can be forfeited when fraud proceeds are used to pay for expenses or improvements to that property." *United States v. Kenner, 443 F. Supp.3d 354, 372 (E.D.N.Y. 2020)* (citing *United States v. Schlesinger, 261 F. App'x 355, 361 (2d Cir. 2008)*).

Moreover, regardless of whether Petitioner has paid mortgages, taxes, and bills on the Property, she has failed to demonstrate that she had a priority of ownership of the Property at the time of the criminal offense. In *Watts*, the Second Circuit explained that:

> [A] petitioner is unlikely ever to prevail at an ancillary hearing under *§ 853(n)(6)(A)* where the forfeited property consists of 'proceeds' derived from or traceable to a criminal offense. Because, by definition, the proceeds of an offense do not exist before the offense is committed, **[\*15]** and because the government's interest under the relation-back doctrine immediately vests upon the commission of that offense, any proceeds that ensue from the criminal act belong to the government from the moment that they come into existence.

*Watts, 786 F.3d at 166-67* (internal quotation marks and citations omitted).

In this case, the jury found that Defendant conspired to commit mail and wire fraud from December 1990 to November 2008, and money laundering from March 1997 to November 2008. *See*, Jury Verdict; Indictment at ⬜⬜ 18, 20. Additionally, the Court has found that the proceeds from the fraud contributed to the purchase of the Property. *See*, M&O at 12, 18. Accordingly, the Court finds that the Government's interest in the Property vested in December 1990, well before Petitioner's purchase of the Property in 2003 and the purported creation of a constructive trust in 2007. *See*, Pet. at ⬜⬜ 1-3. Petitioner has not articulated how an ancillary hearing or discovery will change the timing of the relevant events here. In order to state plausibly a claim to relief under *§ 853(n)(6)(A)*, Petitioner must allege that she has a superior interest in the Property, not just an ownership interest in the Property. *See*, *Watts, 786 F.3d at 166-69*. Therefore, the **[*16]** Government's motion to dismiss the Petition is granted pursuant to *Federal Rule of Criminal Procedure 32.2(c)(1)(A)*.

## CONCLUSION

For the reasons set forth above, the Government's motion to dismiss the ancillary petition of Jeanne Romano is granted, and the third party motion for a hearing to adjudicate the third party claim of Jeanne Romano is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York

February 2, 2022

/s/ Dora L. Irizarry

DORA L. IRIZARRY

United States District Judge

2011 WL 2450991
Only the Westlaw citation is currently available.
United States Court of Appeals,
Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Steven E. WARSHAK, Defendant

and

Carri Warshak, Claimant–Appellant.

No. 09–3321.
|
March 30, 2011.

On Appeal from the United States District Court for the Southern District of Ohio.

**Attorneys and Law Firms**

Donetta D. Wiethe, Assistant U.S. Attorney, U.S. Attorney's Office, Cincinnati, OH, for Plaintiff–Appellee.

Dennis A. Lieberman, Flanagan, Lieberman, Hoffman & Swaim, Dayton, OH, for Claimant–Appellant.

Before SUTTON and GRIFFIN, Circuit Judges; ECONOMUS, District Judge. [*]

*ORDER*

PER CURIAM.

**\*1** Carri Warshak appeals from a Final Order of Forfeiture entered by the district court in her husband's criminal case. The parties have waived oral argument, and this panel unanimously agrees that oral argument is not needed. Fed. R.App. P. 34(a).

On February 27, 2008, a jury convicted Steven Warshak on 93 counts, including conspiracy, mail fraud, wire fraud, bank fraud, money laundering, and obstruction relating to his operation of Berkeley Premium Nutraceuticals. The jury also rendered a special verdict, finding that thirteen of Steven's assets were forfeitable as the proceeds of specific money laundering activity or as property involved in a money laundering transaction. Carri Warshak, the claimant here, filed a verified petition asserting an interest in certain real

property and trust accounts. Carri was not indicted and the district court did not find that she was involved in or aware of her husband's criminal activities.

The Government filed a motion for summary judgment on the petition. The district court entered an order granting the Government's motion, in relevant part finding that Carri had failed to establish that she had an interest in the property superior to Steven's at the time the acts giving rise to the forfeiture occurred, and separately entered a final order of forfeiture. This appeal followed.

We review the district court's interpretation of the forfeiture laws de novo. *United States v. O'Dell,* 247 F.3d 655, 679 (6th Cir.2001). The Government has the burden to prove forfeiture by a preponderance of the evidence. *United States v. Hall,* 411 F.3d 651, 654 (6th Cir.2005). Findings of fact are reviewed for clear error, but the question of whether those facts are sufficient to give rise to a criminal forfeiture is reviewed de novo. *O'Dell,* 247 F.3d at 679.

A defendant's property is forfeited to the Government where the property constitutes or is derived from proceeds of the criminal activity, or where such property was used to commit or facilitate the commission of a crime. 21 U.S.C. § 853(a). A third party may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." *United States v. Salti,* 579 F.3d 656, 661 (6th Cir.2009) (quoting 21 U.S.C. § 853(n)(2)). The petitioner has the burden to prove by the preponderance of the evidence either: 1) that she has a right, title, or interest that was either vested in her rather than the defendant, or was superior to that of the defendant at the time of the acts giving rise to the forfeiture; or 2) that she is a bona fide purchaser for value of the property and ' "was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under" ' the statute. *Id.* at 661–62 (quoting 21 U.S.C. § 853(n)(6)).

Carri does not assert that she is a bona fide purchaser for value with respect to any of the property. With respect to the trust property, Carri asserts that her legal rights in the trusts are superior to Steven's. With respect to the real property, Carri asserts that she has dower rights in the Ohio property and a community property interest in the California property which cannot be forfeited to the Government. She asserts no interest

in any other property on appeal. To the extent that Carri is challenging Steven's underlying criminal convictions, she lacks standing to do so. Nonetheless, it is noted that this court recently affirmed Steven's convictions and criminal forfeiture counts on appeal. *United States v. Warshak,* Nos. 08–3997, etc., 631 F.3d 266, 2010 WL 5071766 (6th Cir. Dec.14, 2010). Accordingly, Carri's argument that the property cannot be forfeited to the government because Steven's convictions are invalid is without merit.

**\*2** With respect to the real property, the jury found in its special verdict that such property was forfeitable either as the proceeds of crime or as traceable to a money laundering transaction. The record reflects that there is evidence that the property was purchased with the proceeds of Steven's fraudulent activity. The jury's finding that the properties were purchased with funds derived from the fraud necessarily implies that the properties were purchased after the criminal acts took place. Section 853 contains a "relation-back provision" which states:

> "All right, title, and interest in property described in [§ 853] vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and therefore shall be forfeited to the United States, unless the transferee establishes" his entitlement to such property pursuant to § 853(n)....

*Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 625 n. 4 (1989) (quoting 21 U.S.C. § 853(c)).

Carri asserts a community property interest in the California property. Other courts of appeals, considering the effect of the relation-back doctrine on community property rights, have concluded that where property is acquired with the proceeds of criminal activity, a community property interest is never created in the innocent spouse. *See United States v. Hooper,* 229 F.3d 818, 821–22 (9th Cir.2000); *United States v. Martinez,* 228 F.3d 587, 590 (5th Cir.2000). This is so because "[p]roceeds of crime ... do not precede the crime." *Hooper,* 229 F.3d at 822. Steven purchased the California property with the proceeds of his fraud. Accordingly, Carri never acquired a community property interest in the California property.

Carri claims an inalienable dower right in the Ohio property under Ohio law. The Ohio Supreme Court has held that "[d]uring the lifetime of both spouses, dower is a contingent inchoate right and becomes vested in the surviving spouse only upon the death of the other spouse." *Goodman v. Gerstle,* 158 Ohio St. 353, 109 N.E.2d 489, 492 (Ohio 1952). As Steven is still alive, Cam's dower right in the property remains inchoate. Moreover, the Ohio property, like the California property, was purchased with the proceeds of crime. Accordingly, title to the property vested in the Government when it was purchased. *See United States v. Certain Real Prop. Located at 2525 Leroy Lane, W. Bloomfield, Mich.,* 910 F.2d 343, 350 (6th Cir.1990). Thus Card has no legal interest in the Ohio property.

Carri also claims that because her interest in the trust accounts is superior to Steven's, these assets are not forfeitable to the Government. However, as the Supreme Court has explained:

> § 853(c) reflects the application of the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture. Concluding that [the defendant] cannot give good title to such property to petitioner because he did not hold good title is neither extraordinary or novel.

**\*3** *Caplin & Drysdale, Chartered,* 491 U.S. at 627.

Here, the jury specifically found that both the trusts were forfeitable either as the proceeds of crime or as property traceable to a money laundering transaction. The record supports this conclusion. The funds in these accounts belonged to the Government before Steven ever created the trusts for Carri. Therefore, Steven had no good title to pass to Carri, and she has no legal interest in these accounts that would prevent their forfeiture.

The district court correctly found that Carri had no legal interest in any of the properties at issue that would prevent their forfeiture to the government. Accordingly, the district court's March 4, 2009, Final Order of Forfeiture is affirmed.

**All Citations**

Not Reported in F.3d, 2011 WL 2450991

---

**Footnotes**

\*      The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.