Karen Kearney 12/20/2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA,

        Plaintiff,

                         Docket No.
  - against -           09-CR-168

MICHAEL ROMANO and WILLIAM KEARNEY,

        Defendants.

---------------------------------------------------X

                      December 20, 2024
                      10:00 a.m.

     DEPOSITION of KAREN KEARNEY, the witness herein, taken by attorney for the Defendants, pursuant to Federal Rules of Civil Procedure, and Order, held web-conference, before Joanne Maggiore, a Stenotype Reporter and Notary Public within and for the State of New York.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

A P P E A R A N C E S:


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
        Attorneys for Plaintiff
        610 Federal Plaza, 5th Floor
      Central Islip, New York  11772

BY:   DIANE C. LEONARDO, AUSA

Karen Kearney 12/20/2024

F E D E R A L   S T I P U L A T I O N S

     IT IS HEREBY STIPULATED AND AGREED by and between the

attorneys for the respective parties herein, that the

sealing, filing and certification of the within

deposition be waived;

     IT IS FURTHER STIPULATED AND AGREED that all

objections, except as to form, are reserved to the time

of trial;

     IT IS FURTHER STIPULATED AND AGREED that the

transcript of this deposition may be signed before any

Notary Public, with the same force and effect as if

signed before a clerk or Judge of the Court;

     IT IS FURTHER STIPULATED AND AGREED that all rights

provided to all parties by the F.R.C.P. cannot be deemed

waived, and the appropriate sections of the F.R.C.P.

shall be controlling with respect thereto.

                         oo0oo

Karen Kearney 12/20/2024

THE COURT REPORTER:  It is hereby stipulated and agreed by and between counsel for all parties present that this deposition is being conducted remotely by videoconference, and that the court reporter, witness, and all counsel are in separate remote locations and participating via Zoom under the control of Bee Reporting Agency, Inc.

It is further stipulated that this videoconference will not be recorded in any manner, and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

Before I swear in the witness, I will ask each counsel to stipulate on the record that I, the court reporter, may swear in the witness even though she is not physically in the presence of the witness, and that there is no objection to that at this time, nor will there be an objection to it at a later date.

        MS. LEONARDO: So stipulated.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K A R E N   K E A R N E Y,  having first been duly sworn by the Notary Public, was examined and testified as follows:

Q.    Please state your name for the record.

A.    Karen Kearney.

Q.    Where do you reside?

A.    38 Meroke Lane, East Islip, New York 11730.

EXAMINATION BY

MS. DIANE LEONARDO, ESQ.:

Q.    Good morning, Ms. Kearney.  My name is Diane Leonardo.  I represent the United States in this case in which you have filed a claim with regard to the property at 8 Valerie Place in East Islip.  If it's okay, I'll refer to it as 8 Valerie Place with the understanding that's what we're referring to.

You're at your home right now?

A.    Actually I'm in my office at work.

Q.    Is anybody with you?

A.    No.

Q.    Do you have any papers in front of you?

A.    I have a folder, yeah.

Karen Kearney 12/20/2024

K. KEARNEY

Q.   If at any time you need to refer to something, if you can please identify for us what you are referring to.

A.   Okay.

Q.   So I'll ask you some questions.  If I ask you anything that you don't understand, let me know.  If you don't remember something, you need to look at your notes, that's fine.  Again, just let us know what you're referring to.  If at any time you need a break, let me know.  The thing is you can't take a break in the middle of a question.

As you see the court reporter is here.  So all your responses have to be verbal.  So yes or no.

A.   Okay.  I'm just very nervous.  Sometimes I might stutter.  If you let me get a chance to collect my thoughts, take a breath.

Q.   Sure, sure.

A.   If that happens it's a little embarrassing, you know.

Q.   It's fine.  If you need a minute to answer a question, that's fine.  It's not a problem.  I know we're going back many, many

Karen Kearney 12/20/2024

K. KEARNEY

years on this.  So it's a little bit of memory.
So if you need to take a minute, that's fine.

A.    All right.

Q.    So can you just describe your
educational background?

A.    I have a graduate degree.  I am a
licensed clinical social worker.  I attended
Adelphi University, graduated in 1999.

Q.    I'm sorry.  And then you worked as
a licensed clinical social worker?

A.    Yes.  I have a private practice.
You know, I'm an LCSWPC.  I have been working in
the field for approximately 25 years.  You know,
self-employed for most of that time.

Q.    We are not going to put this on the
record.  For identification purposes, please
give us your date of birth and Social Security
number.

A.    Sure.  It's XX/XX/XXXX,
XXX-XX-XXXX.

Q.    Again, that's not on the record.

So when you graduated, where were
you employed?

A.    When I first graduated I worked for

Karen Kearney 12/20/2024

K. KEARNEY

a place called The Life Balance Center and also ACLD and UCP, United Cerebral Palsy.

Q.    When did you work for those two place, approximately?

A.    Say that again.

Q.    Approximately, when did you work for those two places?

A.    1995-96 until about 1998.

Q.    Did you work somewhere else after 1998?

A.    I have just been self-employed in my practice.

Q.    Is your practice out of your house or do you have a separate office?

A.    I have a separate office.

Q.    Where is that located?

A.    That's 55 Carleton Avenue, East Islip 11730.

Q.    What was the address?

A.    55.

Q.    You are currently divorced from Mr. Kearney?

A.    Yes.

Q.    When were you first married?

Karen Kearney 12/20/2024

K. KEARNEY

A.    August 25, 2001.

Q.    When you first got married, were you still working?

A.    Yes.

Q.    It's a little bit of lag when we do this on Zoom too.

In 2001, where did you work?  You were self-employed?

A.    I was working at United Cerebral Palsy and private practice.  Like a subcontractor for, you know, a group.  My own tax ID.  Stuff like that.

Q.    Okay.  In 2001, do you recall what your approximate salary was?

A.    $25,000.  I can't 100 percent recall.  I'd have to look.

Q.    Is there something you can look at now that you'd like to look at?

A.    Oh, no.  I don't have it now.

Q.    You are also going to get a copy of the transcript.  So at any time if you can't remember something, we can leave a blank in the transcript.

A.    Okay.

Karen Kearney 12/20/2024

K. KEARNEY

Q.    You can go back and fill it in later.

A.    Oh, okay.

Q.    Yeah.  If it's approximately $25,000, that's fine.  We are going back 23 years ago.  So it's a long time.

When you first got married, where did you and Mr. Kearney reside?

A.    1305 North Windsor, Bay Shore.  The North Windsor house.

Q.    And that was his house?

A.    Yes.

Q.    And he purchased that prior to you getting married?

A.    Yes.

Q.    Do you know how much he bought that house for?

A.    Without looking back at my notes, $115,000.

Q.    I know in some of the documents you provided to us that's in there.  So we have a number.  I wanted to see if you recalled.

Do you know when the house was sold, approximately?

Karen Kearney 12/20/2024

K. KEARNEY

A.    Give me a second.  2003.  I'd have to go back and look.

Q.    Do you know if it was sold around the time that he bought the Valerie Place?

A.    Yes.

Q.    8 Valerie Place was bought in 2003?

A.    Yes.

Q.    Do you know how much the purchase price was for 8 Valerie Place?

A.    Yes, approximately $560,000.

Q.    Do you recall how much the down payment was?

A.    I'd have to go back and look.  I can't recall off the top of my head.

Q.    And do you know where the funds for the down payment came from?

A.    Yes, the sale of North Windsor, some money from his family, and a mortgage.

Q.    Do you know how much money came from the family?

A.    In my documents -- you know, without looking at my documents, approximately what I can say is about $30,000.  I'd have to look back.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

Q.     When you say "family," who do you mean by family?

A.     His mom.

Q.     Mom, dad?

A.     Yes.

Q.     What was his mother's name?

A.     Camille Kearney.

Q.     Do you know when that approximate $30,000 was deposited into an account?

A.     I don't recall.

Q.     The mortgage, do you recall who the mortgage was this?

A.     I don't recall.

Q.     Was it City Mortgage?  Does that sound right?

A.     Valerie Place was City Mortgage. I'd have to look back.

Q.     That was my question.  The mortgage for Valerie Place was City Mortgage?

A.     Yes, yes.

Q.     That was in the amount of approximately $289,000?

A.     I believe so.

Q.     We can go through your records.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

A.    Okay.

Q.    It will be in there.  So we can go through that also.

So when you and Mr. Kearney first got married, did you have joint bank accounts together?

A.    We had one.

Q.    Which account did you have as a joint account?

A.    I believe it was HSBC.

Q.    Do you recall the number, the last four?

A.    That, I don't.  I can tell you the branch is closed.

Q.    No problem.  During the time that you were married, was that the only joint bank account that you and your ex-husband had?

A.    Yes, I believe so.

Q.    In 2001, when you first got married, did you know where he worked?

A.    Yes.

Q.    Where did he work?

A.    Wall Street Rare Coins.

Q.    Did you know what he did there?

Karen Kearney 12/20/2024

K. KEARNEY

A.    Yes.

Q.    What did he do?

A.    He was a salesman.

Q.    Did there come a time that the name of the company changed?

A.    Yes.

Q.    Do you know what it changed to?

A.    Northeast Gold and Silver.

Q.    You sound like there's a question mark.

A.    Northeast Gold and Silver.

Q.    Was it also called Atlantic Coin Galleries at one point, the business?

A.    I believe so.  I can't 100 percent say.

Q.    Do you have any knowledge of why the name changed from Wall Street Rare Coins to Northeast Gold and Silver?

A.    I have no -- I don't have any knowledge of that.

Q.    Was the business located in the same location or did it move when the names changed?

A.    It moved, but I don't know when.

Karen Kearney 12/20/2024

K. KEARNEY

Q.    Northeast Gold and Silver, was that at 654 Montauk Highway?

A.    I believe so.

Q.    That building, is that in Lindenhurst?  Is the building located in Lindenhurst?

A.    I believe so, yes.  Yes.

Q.    I believe your ex-husband and Michael Romano still own that building?

A.    I believe so, yeah.

Q.    So in 2003 when you bought 8 Valerie Place, did you and Mr. Kearney have any joint accounts in 2003?

A.    I'm sorry.  Say that again.

Q.    In 2003, did you have any joint accounts with your ex-husband?

A.    I don't recall.

Q.    I'll rephrase that.  It's a bad question.

The only joint account that you ever had with him during the marriage was HSBC?

A.    Yes, I believe so.

Q.    Was his only salary from the coin businesses?

Karen Kearney 12/20/2024

                              K. KEARNEY

          A.    I believe so.

          Q.    Did he have income from any other sources?

          A.    No, not that I know of.

          Q.    Were you ever a signatory on any of his accounts, any accounts that was in his name?

          A.    No.

          Q.    Was he ever a signatory on any of your accounts?

          A.    No.

          Q.    But were there times he made deposits, like salary deposits of his into your account?

          A.    Yes, a small account that I kept for the kids.  I believe that was seized.

          Q.    I believe so.  I believe so.

                Do you know why he would deposit salary checks into your account?

          A.    Oh, I can't say that it was a salary check.  You know, just a little money to pay for things for the kids.

          Q.    Did you deposit funds into any of his accounts?

          A.    Not that I recall.

Karen Kearney 12/20/2024

K. KEARNEY

Q.   So your salary would go into your personal accounts?

A.   Yes.

Q.   Did you also have a business account?

A.   Yes.

Q.   Was that at Astoria?

A.   No, no.  It's through Capital One. I think it should be.  I think we listed that for you.  Right?

Q.   Probably.  Again, we can go to -- we will go to the records.

But do you know what the house, the 1305 Windsor house, do you know what that sold for?

A.   The closing would show probably close to $300,000.

Q.   Do you know how much was left on the mortgage or if there was a mortgage?

A.   I can't answer that.  I'm not 100 percent sure.

Q.   You were never on that mortgage, you were never part of the Windsor house?

A.   No.

Karen Kearney 12/20/2024

K. KEARNEY

Q.    You were not on his Citibank accounts, right?

A.    No.

Q.    Were you ever on any of his Chase accounts?

A.    I don't believe so.

Q.    Okay.  Any of the Fidelity investment accounts?

A.    I don't know.  No, I don't believe so.

Q.    How about the ING account?

A.    I don't believe.

Q.    Smith Barney?

A.    I don't believe so.

Q.    How about Wachovia?

A.    I don't believe so.  I don't know if I even heard of that one.

Q.    Did you know he had accounts at all the different places?

A.    No.

Q.    I know you provided us with records.  Do you have a copy in front of you?

A.    I should have everything that I shared with you.  Hopefully.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

Q.    With regard to specific questions, I'll try to show it to you on the screen.  I'll do my best to do that.  But I want to start with you provided us with answers to interrogatories.

A.    Do you want me to grab it?

Q.    If you want to look at it.  It's probably easier to do it that way.  I'll mark it as Exhibit A.  Exhibit B.  Sorry.  What I can do is e-mail you a copy.

A.    Okay.

Q.    It will be Exhibit B.  What I did was -- because you sent us an entire packet, I marked it as one document.  I thought it was a little easier to do it that way.  I'll start, I don't know which order you have it in.  I'll start with the written interrogatory responses you provided to us.  The first one I'll refer to is No. 11.  Do you have that in front of you?

A.    Yes.  11 you said?

Q.    Yes.

A.    Okay, yeah.

Q.    In response to No. 11, you mentioned that you didn't work between 2006 and 2008, right?

Karen Kearney 12/20/2024

K. KEARNEY

A.    Yes.

Q.    Okay.  And then from 2000 to 2014 you were making about $20,000 annually, does that sound familiar?

A.    Yes, I see that.

Q.    With regard to your salary, do you know what account you would normally deposit that into, that $20,000 a year?

A.    Yes, that would be my Capital One business account.

Q.    Okay.  Backing up a touch. Interrogatory No. 10, you indicated that you and your now ex-husband share responsibility for paying the expenses of 8 Valerie Place?

A.    Yes.

Q.    Can you tell us specifically what you are responsible for paying?

A.    Without certainty, I mean household expenses.  You know, child, maybe child care expenses.  Things of the like.

Q.    Not necessarily child care expenses.  What type of household expenses would you pay?

A.    I mean, I can't -- it's a long time

Karen Kearney 12/20/2024

K. KEARNEY

ago, but I could say potentially like let's say a cell phone bill or, you know, the utilities, groceries.  Things of that nature.

Q.    Do you have any records of that, what you paid out of your accounts?

A.    Not from that long ago.  I mean -- wait.  Clarify.  What exactly do you mean? Records of paying for utilities and things like that?

Q.    Sure.  For example, do you have a ledger?  Would you write down your monthly expenses and write down phone bill paid?  LIPA bill paid, would you keep any records like that?

A.    Not anything handwritten per se. But the bills were paid, you know, right.  The lights would have been turned off.

Q.    Okay.

A.    So nothing formal.

Q.    I know it's going back a ways.  In 2006, 2007, would you have paid your bills online like through whatever company it was?  I think it was around the time we could start paying things online.

A.    I can't say with certainty.  You

Karen Kearney 12/20/2024

K. KEARNEY

know, because maybe a little bit of both.  But I can't say yes.  You know, it's hard for me to say.

Q.    I know in some of your responses and documents you provided to us that you've indicated you gave your former attorney Mr. Senft, S-E-N-F-T, documents.

A.    Yes.

Q.    You also indicated he told you that he doesn't have those anymore?

A.    Yes.

Q.    Do you know what you gave him?  Was it bank statements, was it mortgage payments? Was it anything like that?

A.    Well, he requested things of that nature.  And you know, basically we compiled that stuff, whatever mortgage, some of what I have, I think submitted to you.  You know, copies of some of the checks, you know, information regarding my salary, etc., and then we hired him.

Q.    Did you keep a copy of what you gave him?

A.    Well, I don't believe so because I

Karen Kearney 12/20/2024

K. KEARNEY

don't have everything I need.  It was a long time ago, very long time ago.

Q.    Sure.  I think in your responses you also indicated that as of 2008 that you knew the government was trying to seize the house.  Does that sound right?  It's in your response.  Interrogatory No. 5, you mention that you had spoken with your now ex-husband about the forfeiture beginning in 2008?

A.    Which was the time of the arrest, correct?

Q.    Correct.

A.    I believe so.

Q.    So in 2008 you knew that the government was seeking to forfeit the house?

A.    I can't recall 100 percent.  Otherwise, I'd be making an assumption.  You know.

Q.    Did you answer the interrogatories on your own or did someone help you?

A.    I had a friend help me.

Q.    At the end of the document you signed it?

A.    I believe so. My copy.  You mean

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

was it me who signed it?

Q.   Yes.

A.   Yes.

Q.   Do you need me to show it?

A.   I have it here.  It's my photocopy.

Q.   Was your friend that helped you an attorney or somebody else?

A.   Somebody else.

Q.   So you also mention in your interrogatories that the mortgage was paid for by your ex-husband, that's Interrogatory No. 7?

A.   Yes.

Q.   I'm sorry I keep jumping around.

A.   No, no.  I'm doing the best that I can.

Q.   Interrogatory No. 7, you were asked to identify the funds and the source of the funds that you used to pay the mortgage on the property.

A.   Yes.

Q.   And your answer --

A.   You are talking about 8 Valerie?

Q.   Correct.  Yes.  And your answer was William Kearney, right?

Karen Kearney 12/20/2024

K. KEARNEY

A.    Yes.

Q.    So do you have any records -- I will back up.  Did you ever make any mortgage payments on the house at 8 Valerie?

A.    Yes.

Q.    What account would that have come from?

A.    That would have come from my salary and my business account.  You know, depending, check from one or the other.

Q.    Prior to his arrest, did you make any mortgage payments?

A.    No.

Q.    That was a bad question.  When were you divorced?

A.    It was September, it was official September 2020.

Q.    Was he still in jail at that time?

A.    He was just released, I think. March 2020.  No.  I'm not 100 percent sure of the date, the exact date.

Q.    After his arrest, did he still live at 8 Valerie Place with you?

A.    Yes.

Karen Kearney 12/20/2024

                          K. KEARNEY

          Q.    Did there come a time he stopped

living there?

          A.    No.  Only upon surrendering.

          Q.    Do you recall when that was?

          A.    2014.  Give me a second.  Yes, I

believe it was 2014.

          Q.    So between 2008 and 2014, do you

know who paid the mortgage or how the mortgage

was paid?

          A.    I paid the mortgage.  We paid the

mortgage, I guess, you know.

          Q.    Was he employed at that point after

his arrest?

          A.    Yes.

          Q.    And do you recall where he was

employed after his arrest in 2008?

          A.    I don't.

          Q.    Do you know how much he was making?

          A.    I don't recall.

          Q.    After he surrendered he was

incarcerated in 2014, then you were making the

mortgage payments?

          A.    Yes, I was.

          Q.    I have to ask this.  So if your

Karen Kearney 12/20/2024

K. KEARNEY

salary was $25,000, how were you able to make those mortgage payments?

A.    I had help from his mother and my family.

Q.    Do you know to what extent they helped in terms of how much money?

A.    I don't recall.  It was a long time ago.

Q.    Do you have any records of his mom or your family giving you help?

A.    It's a long time ago.  I don't know.

Q.    Would they give you checks or cash or both?

A.    I don't recall with certainty.  I don't want to guess.  But there's only a few options really.

Q.    I guess the question is so you won't have any records of that?

A.    I really have to look back to know. I can't say right this second.  But I would have to look back, yes.

Q.    If it's easier for you I can show you what I'm referring to on the screen.  We are

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

going to have different page numbers.

A.    Okay.

Q.    The way we got the packet, it was a packet of papers, there were some Post-It notes on some of them.  Are they your Post-It notes or somebody else's?

A.    Some of them may have been mine.  I would have to see it to tell.

Q.    We will get to that in a second. I'll try to share.

A.    Are we moving from the interrogatories?

Q.    Yes.  Can you see my screen?

A.    Yes, yes.  I just can't see the whole thing.  I'm not good with this either. Sorry.

Q.    Hang on.  Okay.

A.    That's October 10, 2003, correct?

Q.    Right.  I don't think you have it in the same order I do.

A.    Okay.

Q.    So this is going to still be Exhibit B, which is your document responses on the screen again.  I'll send you a copy of how

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

we have it marked.  In the bottom right hand corner I added Bates number.  So for the record, it's page 11.  It's named Kearney Document Response 0011.

A.    I don't want to mess anything with Zoom.  You said the first page was from Michelle Goetz, which is No. 11 on your number line?

Q.    Correct.

A.    I'm going to write on mine.

Q.    Do you want me to e-mail you a copy now?

A.    If I come to something that I can't find, I'll ask you to do that.  Hopefully, I have everything.

Q.    At the top there's actually a heading that says Kearney Documents Page 2.  I don't know if you put that on.

A.    Yes, I do see that.  Yes.

Q.    All right.  At the top it says Kearney Documents Page 2, on the bottom it has my numbers, which is page 12.

A.    Okay.

Q.    So this is your closing statement. It has, for example, it says paid on signing of

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

contract, $150,000.  Do you see that?

A.    Yes.

Q.    Do you know what that money means, where that came from?  Was it a check, something else?

A.    Give me one second.  I'm looking for copies, submitted copies to you.  No, I could only -- I would only be assuming that it was a check.  I don't have a copy of the check here.

Q.    By the way, when you made your mortgage payments, were your property taxes escrowed in that mortgage payment?

A.    Yes, in the original mortgage, and then there was a refinance to separate it.  I believe that to be the case without having documents in front of me.

Q.    When you say "there was a refinance," was that also City Mortgage or did you go to a different company?

A.    I believe so.

Q.    You stayed with City Mortgage or you went to a different company?

A.    I believe it continued to be

Karen Kearney 12/20/2024

K. KEARNEY

City Mortgage.

Q.    Do you know how then the real estate taxes were paid?

A.    Yes, quarterly.  Yes, they were paid I guess whenever they were due, due dates.

Q.    And before Mr. Kearney was incarcerated, would he make those payments or would you make the payments or was it combined?

A.    I can't recall.

Q.    Do you recall when you approximately refinanced?

A.    I would have to look to give you a date.

Q.    If you go to the next page, which is my page 13.  There's a notation.  Item 1 is I believe it to be the mortgage was $289,324.

A.    Okay.

Q.    Then Item 2 says "Certified check drawn on purchaser to the order of the sellers," and there was a check in the amount of $114,395.

A.    Yes.

Q.    Do you know where that check came from?  Do you know what that means?

A.    No, I do not.  I can't recall at

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

this time.

Q.   Immediately underneath it says $10,700.  I don't know if it was the initial check.  Do you know if it was?

A.   I can't say with certainty without figuring it out with the papers.

Q.   So I'm just going to jump around a little bit in your documents that you produced to us.  It's my number 61, at the top it's your number 51.  It's the just a typewritten statement that says "The following documents," and you can see it on my screen.

A.   You said it's 51?

Q.   Your 51.

A.   I see it.

Q.   Is that typewritten by your ex-husband?

A.   Say that again.

Q.   Is this typewritten by your ex-husband?

A.   Yes.

Q.   It just says "The following document from one, a car accident, which I received a settlement of $15,000, and my

Karen Kearney 12/20/2024

K. KEARNEY

father's life insurance policy for $45,548.  The next document then is our page 62, your page 52, which is a copy of the life insurance check.

A.    Yes, I have that.

Q.    Which is dated January 31, 2017.

A.    2007, right?

Q.    Sorry.  My bad.  It looks like it says January 31, 2007.

A.    Okay.

Q.    Do you know where that check was deposited?  It says on the back Citibank.  But do you know which account that went into?

A.    I don't.  I don't have anything else.  Is it in that?

Q.    It's unclear to me.

A.    It looks like highlighted into this account, correct?  But I can't say 100 percent accuracy.

Q.    For the record, this is page 64, your page 54.  It's just a copy of the closing statement which said the deposit of $45,000.  As far as you recall, that's not your account, right?

A.    No.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

Q.   It refers to it being a savings account or savings activity?

A.   I believe so.  That's what it says.

Q.   The next page, which is your page 55, my page 65.  It looks like there was a settlement on July 20, 1999 in the amount of $15,000.  Do you see that?

A.   I do.

Q.   You weren't married at that time, right?

A.   No, no.

Q.   Did you know what this was for or what account it went into or what this has to do with anything right now?

A.   Again, I'm not 100 percent sure with certainty.  I believe it was a car accident.  But aside from any kind of account, no, I have no knowledge of any of that.

Q.   Do you know if any of that $15,000 went in to purchase the house at Windsor?

A.   I do not recall.  I'm not sure.

Q.   The life insurance check was issued in 2007?

A.   Yeah.

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

K. KEARNEY

Q. And that was after you already bought Valerie Place, right?

A. Yes, yes. After we purchased it.

Q. In addition to what you have produced to us in this packet, other than your former attorney, do you know if anyone else would have any records of mortgage payments or bank accounts?

A. No, I don't.

MS. LEONARDO: No further questions.

THE WITNESS: Thank you for taking the time and making this not so nerve wrecking.

Q. I have one more question. You had an attorney file a petition for you with regard to the property. I think it was Mr. Campanelli.

A. Yes.

Q. Do you have a copy of that or I can show you a copy of that?

A. Give me a second. I believe so. Do you have one up there or no?

Q. I can show you. I'll ask you if it's your signature.

Karen Kearney 12/20/2024

K. KEARNEY

A.   Oh, okay.

Q.   I'll show you that real quick.

MS. LEONARDO:  We will mark this as Exhibit A.

Q.   This is your petition for the property.  Can you see that?

A.   Yes.

Q.   So this was actually filed in court, May 19, 2021.  As I said, we are marking this as Exhibit A.  That's your signature at the bottom?

A.   Yes.  It is.

Q.   Paragraph 9, where there is a statement the home was purchased, 8 Valerie Place, for the sum of $560,000, which was paid for from the sale of 1305 North Windsor?

A.   Yes.

Q.   And assistance from his family and then the mortgage?

A.   Yes, yes.

Q.   But in this paragraph the mortgage was actually more like $289,000, is that right?  It wasn't $200,000.

A.   This paragraph that we are looking

Karen Kearney 12/20/2024

K. KEARNEY

at right now?

Q.    Yes.

A.    It says $200,000, right?

Q.    Right.  But I think the mortgage was about 289.

A.    I have to look back.

Q.    In this paragraph we are talking about assistance from his family.  That's the one that was from his mother?

A.    Yes.

MS. LEONARDO:  I'll send you a copy of what we marked.  I really have no further questions.

(Whereupon, Plaintiff's Exhibits A and B, Documents, were deemed marked for identification.)

(Time noted:  10:45 a.m.)

Karen Kearney 12/20/2024

A C K N O W L E D G M E N T

STATE OF NEW YORK    )

                SS:

COUNTY OF            )

     I, KAREN KEARNEY, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of December 20, 2024; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

                    _____
                    KAREN KEARNEY

Subscribed and sworn to

Before me this _____ day

of _____, 20__.

_____
NOTARY PUBLIC

Free State Reporting, Inc. 410-974-0947

Karen Kearney 12/20/2024

--------------- I N D E X -----------------

WITNESS                    EXAMINATION BY    PAGE

KAREN KEARNEY          MS. LEONARDO     5-37

----------------- EXHIBITS ----------------

DEFENDANT'S   (DEEMED MARKED)

EXHIBIT A              PETITION              37

EXHIBIT B              DOCUMENT RESPONSES   37


                          oOo


          (EXHIBITS WERE RETAINED BY COUNSEL)

40

C E R T I F I C A T I O N

STATE OF NEW YORK   )
                    )  ss.:
COUNTY OF NASSAU    )

         I, JOANNE MAGGIORE, a Notary Public within and for the State of New York, do hereby certify:

         That KAREN KEARNEY the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record of the testimony given by such witness.

         I further certify that I am not related to any of the parties to the action by blood or marriage; and that I am in no way interested in the outcome of this matter.

         IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of December 2024.

                              _____
                              JOANNE MAGGIORE